```
 1                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF CONNECTICUT
 2
      - - - - - - - - - - - - - - x
 3                                :
      UNITED STATES OF AMERICA,    :   No. 3:18-cr-00095(SRU)
 4                  Government,    :   915 Lafayette Boulevard
                                  :   Bridgeport, Connecticut
 5            v.                   :
                                  :   October 29, 2018
 6      YEHUDI MANZANO,            :
                    Defendant.    :
 7      - - - - - - - - - - - - - - x

 8              MOTION HEARING (CORRECTED VERSION)

 9      B E F O R E:

10         THE HONORABLE STEFAN R. UNDERHILL, U. S. D. J.

11
      A P P E A R A N C E S:
12
            FOR THE GOVERNMENT:
13
                UNITED STATES ATTORNEY'S OFFICE
14                  157 Church Street, 25th Floor
                    New Haven, Connecticut  06510
15              BY:  NEERAJ N. PATEL, AUSA
                    SARAH P. KARWAN, AUSA
16

17         FOR THE DEFENDANT:

18              THE PATTIS LAW FIRM, LLC
                    383 Orange Street, First Floor
19                  New Haven, Connecticut  06511
                BY:  NORMAN A. PATTIS, ESQ.
20

21      GUARDIAN AD LITEM FOR THE VICTIM/MINOR:

22              VICTIM RIGHTS CENTER OF CT, INC.
                    8 Research Parkway
23                  Wallingford, Connecticut  06492
                BY:  MAURA CROSSIN, ESQ.

24

25                              Sharon L. Masse, RMR, CRR
                                Official Court Reporter
```

```
 1                    (Proceedings commenced at 10:54 a.m.)

 2              THE COURT:  All right.  What issues do we have

 3   to take up?

 4              MR. PATTIS:  I raised a series of motions on the

 5   26th, which was last Friday, and it would be my hope that

 6   as many of them as possible could be resolved today.

 7              The first issue I raised on page 1 -- or 2,

 8   rather, of my motion was some confusion on my part about

 9   how the jury was going to be charged as to the 2251 count.

10   This is the conjunctive/disjunctive argument.  I don't

11   know if the Court has -- and I believe the Court was aware

12   that there was some disagreement between the parties as to

13   how this would be charged on Thursday evening.  I feel

14   that I need to know what I'm shooting at before we begin

15   evidence.  And so is the Court prepared to make a decision

16   here?

17              THE COURT:  I am.  I forgot to bring out with me

18   your pleading from Friday.  So --

19              MR. PATTIS:  May I approach?

20              THE COURT:  Yes, sure.

21              MR. PATTIS:  (Handing.)

22              THE COURT:  Well, I've taken a look at this

23   issue, and in my view the law is clear that there is a

24   minimal interstate commerce requirement here.  It seems

25   surprising to me; but, apparently, the mere fact that the
```

1   recording equipment was manufactured outside of

2   Connecticut is sufficient to meet the interstate commerce

3   requirement of the statute.

4        MR. PATTIS:  My question was, if you compare the

5   language of 18 U.S.C. 2251 with the indictment, the

6   indictment charges it in a way that's at variance with the

7   statute, and it's my view that the government is bound by

8   that.  In other words, in the government's indictment it

9   was "knew or had reason to know," colon, and then A, B and

10  C.  And the know or have reason to know should modify each

11  of those three elements.  The statute is not written that

12  way, but that's how the government chose to charge this

13  case, and that's how we're prepared to defend it on the

14  basis that there is a scienter requirement as to each of

15  the alternatives.  If you look at the statute itself, it

16  dispenses with colons and semicolons.

17        THE COURT:  Well, I don't think you can change

18  the requirements of the statute by the way in which the

19  indictment is pled.

20        MR. PATTIS:  You may not be able to.  We didn't

21  move to dismiss on that grounds.  I'd make an oral motion

22  to dismiss then.  Because what we were provided with was

23  notice that the government intended to proceed on a theory

24  that my client knew or had reason to know that this item

25  was transmitted in interstate commerce, not simply that it

1    had passed in interstate commerce.  And that's a

2    significant difference.

3         What the Court will learn and has probably

4    gleaned from the pleadings is this was not an image which

5    was distributed to the world at large; it was moved from a

6    phone and apparently saved onto a Google account; never,

7    you know, distributed in any meaningful way.  So, you

8    know, the government has two theories.  It was produced by

9    a phone that moved in interstate commerce.  It was then

10   distributed to the cloud or to some electronic thing by a

11   thing that -- in a manner that affects interstate

12   commerce.

13        As pled, Judge, this case gave us notice that

14   the government was -- the government gave us notice that

15   it was proceeding that Mr. Manzano had reason to -- knew

16   or had reason to know these things, and we think they have

17   to prove that.  To suggest otherwise is to eliminate

18   scienter from a specific intent crime, and I don't think

19   that's the law, notwithstanding what the statute says.

20        MR. PATEL:  Your Honor, I think that the motion

21   defense -- Attorney Pattis filed raises two issues.  One

22   is whether we have to prove all three interstate elements,

23   which I think the case law -- because the indictment is

24   worded in the conjunctive, the statute is worded in the

25   disjunctive, and I think the case law from all the

1   circuits pretty much states that indictments can be worded

2   in the conjunctive even though the statute is worded in

3   the disjunctive, and that conviction would be supported by

4   proof of any one of those three interstate -- alternative

5   interstate elements.

6           So to that argument, to the extent he's still

7   raising that issue, we would argue that we only have to

8   satisfy any one of those three interstate elements.

9           As to the knowing and have reason to know that,

10   that first element was kind of wordy, and so the colon was

11   there to explain that knowing and have reason to know

12   applied to everything up to that first semicolon because

13   there were so much verbs and interstate aspects to that

14   first interstate element.  I think the case law is --

15   which we've cited in our opposition to the motion to

16   adjourn, talks about several circuits that have held that

17   the knowing and having reason to know only applies to the

18   first interstate alternative that's in the statute, not to

19   all three.

20           And although the Second Circuit hasn't expressly

21   ruled -- hasn't decided that issue, several other circuits

22   have, and the Second Circuit has noted that the reason

23   Congress enacted the other two alternative interstate

24   elements was to allow the government to proceed when

25   knowledge was absent.  And that was *United States v.*

*Holton*, Second Circuit, 2003.

MR. PATTIS: Our position, Judge, is that in the absence of any controlling authority, the government is bound by its information -- or by its indictment, rather; and, you know, we're all competent, at least serviceable writers here. When you introduce a series by a colon and then separate what follows with semicolons, you're attributing the attributes of the thing to the left of the colon to everything in the series on the right. And the government attributed knowledge to the second and third elements, and it's our view that that's the manner in which this case should proceed.

THE COURT: I'm going to deny the motion to dismiss. I think this is not a significant deviation from the statute, and the statute does not impute a knowledge element to the last two options of the interstate commerce requirement. And in my view, this was easily discovered, comparing the statute to the language of the indictment. The government does not, in my view, take on a higher burden by misdescribing the requirements of the statute.

MR. PATTIS: Given that misdescription, Judge, I'd ask for an adjournment of trial, then, because it's one thing to make representations that I'm not going to oppose certain testimony when it served my interest to do so, but now I may seek to preclude the government's use of

1    certain evidence.

2            For example, Friday we received notice of an

3    expert, who's apparently going to rely upon the

4    testimonial equivalent of technology in rendering his

5    opinion.  And we may claim that that is a violation of

6    *Melendez-Diaz.*  I raised that issue most recently a month

7    ago in a state court prosecution where a statistical tool

8    was used to calculate the likelihood of a certain

9    individual's DNA in a mixture.  Candidly, the Court

10   disagreed with me.  But it's my position that when experts

11   rely on a black box in forming their opinion and testify

12   on that opinion, that black box is the functional

13   equivalent of testimony, and I have a right to

14   cross-examine the box.  But I can't do so.  So somebody

15   who's qualified to talk about the box has to come in to

16   offer that testimony.  It's not clear to me that the

17   government is prepared to do that, and I'm not prepared to

18   waive that claim.

19           So I claim surprise by the manner in which this

20   was drafted.  The statute itself is less illuminating in

21   the manner in which it's written than the indictment was.

22   But now if I'm going to have to defend an offense that is

23   a specific intent offense, without a mens rea, that's a

24   different defense than the one I'm prepared to raise.

25           THE COURT:  The statute is not a specific intent

1    statute, except with respect to the first interstate

2    commerce element.  So it doesn't become a specific intent

3    statute through the --

4            MR. PATTIS:  That's not at all clear from the

5    statute itself.  And it's not clear from the case law.  I

6    mean, it doesn't say, for example, knowing in one respect

7    and ignorantly or otherwise, or that it's a strict

8    liability defense with respect to a second alternative.

9    The statute doesn't say that.

10           THE COURT:  Well, I think a fair reading of it

11   makes clear that it's not a specific intent with respect

12   to parts 2 and 3 of the interstate commerce requirement.

13   So I'm going to deny the motion for adjournment.

14           MR. PATTIS:  Okay.  The second issue is I've

15   asked for an adjournment on the grounds that given the

16   manner in which the government crafted this indictment and

17   the manner in which it now is proceeding at trial, I don't

18   know what the grand jury was told to get the indictment.

19   Were they led to believe what the indictment says, that

20   each of them had to be knowing?  Did they know that they

21   were being asked to consider what amounts to a strict

22   liability offense; if the phone moved in interstate

23   commerce, it didn't matter whether you know it or not?

24   Given the manner in which the indictment is written and

25   was signed by the foreperson, I don't know.  So I'm asking

1    for an adjournment of the proceedings, and I'd like an

2    opportunity to brief whether I'm entitled to the complete

3    set of grand jury minutes to challenge what it is the

4    government may or may not have told the grand jury to get

5    this indictment.

6              MR. PATEL:  Your Honor, we would oppose that

7    request.  I don't want to discuss, actually, what was told

8    to the grand jury in an open courtroom, but the -- I would

9    just say that his argument is without merit.  It's hard

10   for me to say without disclosing what was the instructions

11   given to the grand jury.  But it was in accordance with

12   the law, as Your Honor set forth a few minutes ago.

13             MR. PATTIS:  I have no reason to doubt that

14   that's Mr. Patel's perspective, but I'm also the person

15   who's claiming prejudice by the manner in which he

16   amended -- attempted -- or in which he crafted the

17   indictment.  His view was it was intended to clarify a

18   statute that was perhaps too wordy, or I'm maybe putting

19   words in his mouth, that was prolix, and I don't know

20   whether the jurors were invited to consider something

21   other than the statutory requirement given the manner in

22   which the indictment was written.

23             THE COURT:  Well, I'm going to deny the motion

24   for adjournment on that basis.  I think it's unlikely to

25   reveal any prejudicial misconduct by the prosecutor that

1      would justify throwing out the indictment.

2           MR. PATTIS:  Judge, I would note that in the

3      Court's preliminary instructions it substantially agreed

4      with what the defense had written, and there was some

5      discussion Thursday.  If this Court was potentially, I

6      don't want to say misled, but if this Court was inclined

7      to reach a conclusion at variance with the government's

8      theory of the case and the Court has experience with the

9      law and understands the law, how am I to have any

10     confidence that the grand jury was in a better position

11     than you were?  So I'm requesting the release of those

12     grand jury minutes.  If you're not going to adjourn the

13     trial, I'd nonetheless like them to preserve whatever

14     appellate remedies we have, including the Court abused its

15     discretion in not giving us these.

16          THE COURT:  Okay.  We'll talk about that after

17     the trial.

18          MR. PATTIS:  It may be too late for me to seek

19     relief at that point, Judge.  The government, for example,

20     sought an interlocutory appeal on a nullification case

21     when it was clear that, in its view, something was going

22     to proceed on an unlawful basis.  Suppose I had those

23     grand jury minutes and I was able to persuade a court that

24     this trial should not go forward because the indictment

25     was obtained in violation of the law.  It would be too

1    late for my client, who might be serving time at that

2    point.

3                    THE COURT:  Well, I don't think it will be too

4    late.

5                    MR. PATTIS:  If you're not the one serving the

6    time, respectfully, sir.  My client is, and he's got a

7    young family.  I don't think he should be required to bear

8    that risk when there are questions that this Court may not

9    regard as serious -- I do -- as to why the indictment is

10   at variance with the law on its face.

11                   THE COURT:  Well...

12                   MR. PATEL:  Your Honor, again, I don't want to

13   divulge what was discussed to the grand jury when there's

14   members of the public here, but suffice it to say they

15   were instructed in accordance with the law that, as set

16   forth in our jury instructions, which I think is what Your

17   Honor noted, that the knowing and have reason to know only

18   applies to the first interstate element and not the other

19   two.

20                   THE COURT:  All right.  Well, do you have a

21   problem turning over the charge given to the jury?

22                   MR. PATEL:  Just one moment, Your Honor.

23                   (Pause.)

24                   Your Honor, perhaps what we should -- one

25   suggestion is the Court could review the instructions or

1    the minutes in camera and see if it meets the burden --

2    whether there is anything in there that warrants

3    disclosure to the defendant.

4           MR. PATTIS:  Here's the problem.  That's

5    certainly the way it's done in New York State procedure,

6    Judge, but if the grand jury -- if grand jury secrecy is

7    intended to protect against disclosure of investigation

8    for a person wrongfully accused, and there's potential

9    Brady material in here that may or may not affect the

10   integrity of the prosecution, what's the harm in letting

11   the defendant see it?  We're not asking that this go to

12   the *New York Times*.  It was his reputational interest that

13   the grand jury was intended to protect in any case.

14   They've indicted; they've charged.

15          Our view is that the indictment that was signed

16   is materially different than the law they're requesting to

17   be applied in this case on its face.  And so we think

18   we're entitled to see that.

19          THE COURT:  All right.  I think you should turn

20   over the jury charge, the grand jury charge.  It'll be --

21          MR. PATEL:  It will have to be transcribed, Your

22   Honor.  The testimony of the witnesses or the witness has

23   been turned over --

24          THE COURT:  Right.

25          MR. PATEL:  -- but the actual what happens

1    before and after the witness testifies, I don't think

2    that's transcribed in the normal course.

3                THE COURT:  Okay.

4                MR. PATTIS:  So it would have to be transcribed.

5    I don't know if that will be done by tomorrow.

6                THE COURT:  Well, let's -- how were you going to

7    show it to me if you weren't going to transcribe it?

8                MR. PATEL:  I'll have to find out what -- I'll

9    have to contact the court reporter and make arrangements

10   for that to happen.

11               THE COURT:  Okay, let's do that.  It'll be

12   provided to Mr. Pattis to be in confidence.

13               MR. PATTIS:  Understood.  Understood, sir.

14               THE COURT:  Okay.

15               MR. PATTIS:  There is an open question and the

16   Court may want to consider this on a question-by-question

17   basis at trial, and I think you may have indicated -- the

18   Court may have indicated that that was what it was going

19   to do, and that is as to the relevance of the underlying

20   state court prosecution to this prosecution.  I didn't

21   bring my notes with me from Thursday evening.

22               THE COURT:  Well, I don't really understand how

23   that could be potentially relevant.

24               MR. PATTIS:  Well, here's the problem.  Let's go

25   to -- look at Issue Number 6.  I have two sovereigns

1    prosecuting my client at the same time and two different

2    sets of charges.  One depends almost entirely on the

3    credibility of the complaining witness.  The other can be

4    tried, frankly, without her.  And yours is the one that

5    can be tried without her.

6              If my client testifies in this case that he was

7    engaged in consensual activity with her, or he made a

8    mistake of age and was involved with her, that would be

9    admissible in the state court proceeding and will undo his

10   defense in that case where he has to attack her

11   credibility altogether because it doesn't rely on

12   computer-generated evidence, and so forth.  So clearly

13   what happens in this courtroom is going to matter what

14   happens in the other courtroom, from his -- from the

15   standpoint of his interests.  And every decision he makes

16   on evidence here is going to have a bearing on what

17   potentially happens in another trial, in another court.

18             Why should the government be treated any

19   differently in this case?  We had a prosecution pending in

20   the state court with far fewer penalties where the

21   testimony of the accuser is fundamental; and, Judge, we

22   have videotapes filmed of her, ample social media

23   communication where she's done nothing but torture this

24   family, promised to see him ruined, boasted about the

25   types of car she's going to drive with the proceeds of

1    this litigation.  She sued him.  She made law enforcement

2    aware when she first gave a statement about -- or shortly

3    thereafter, if not initially in the first statement, of

4    the existence of this videotape, and yet for some great

5    period of time no prosecution arose.  Is it possible that

6    this is a -- this prosecution is being used as a proxy for

7    the state prosecution, where they don't want her to have

8    to testify?  If they get enough time here -- and you're

9    aware of the mandatory minimum -- there may not be a state

10   prosecution.

11          I agree it doesn't go, strictly speaking, to one

12   of the elements, but my adversary here is the United

13   States government, not the accuser, and the United States

14   government comes in here under the same testimonial

15   burdens, through its agent, I presume, that any other

16   witness does, and its interest in the outcome of this

17   case, its motive in bringing this case I think is fair

18   game for the jury.  And so I would contend that the

19   relationship of the two prosecutions is important for this

20   jury to know in evaluating whether this prosecution is

21   warranted.

22          THE COURT:  What prevents you from subpoenaing

23   the minor to testify at trial?

24          MR. PATTIS:  I don't want her to testify.  I'm

25   not sure I understand the import of that question.

1        THE COURT:  You seem to be complaining that

2   you're going to be able to attack her credibility, but in

3   the federal prosecution they don't have to put her on, and

4   therefore you'll be deprived of that opportunity.

5        MR. PATTIS:  No.  It's a little bit more nuanced

6   than that, and I apologize for not being clear.  The

7   government, in my view, could arguably proceed in this

8   case without the alleged victim.  It would be difficult,

9   but it could.  It cannot proceed in the state court

10  prosecution, which talks about a course of sexual conduct.

11       If my client -- my client may take inconsistent

12  positions in this case and in the defense case.  He may

13  claim here -- he may not contest in this case that he was

14  involved with her, but that he simply didn't know her age

15  or have any reason to know that the items used as part of

16  the crime were moving in interstate commerce.  He may deny

17  any conduct with her altogether in the state court

18  proceeding.

19       You've not seen the videotape yet, and so the

20  videotape does not show his face.  At most it shows a ring

21  on a hand, on a body, and the body is hers, and she'll

22  testify that the hand and the ring was his.  So the State

23  of Connecticut cannot prove penetration, sexual conduct

24  without her testimony in the state court trial.

25       It strikes me that this is one of those vagaries

1    of federalism cases where we had a state court prosecution

2    that predates this one, and somehow this one arose when

3    the sovereigns, at least as Connecticut sovereign, was

4    well aware of this videotape for quite some time, and

5    suddenly we are in a federal forum where my client is

6    facing 15 years.  Anything he says in this court is going

7    to be used against him in another court if he makes an

8    admission.  Somehow I feel jerked around a little bit by

9    the two sovereigns, hand in hand, playing -- playing, in

10   effect, pocket pool with justice.  I realize that it's not

11   double jeopardy in the sense that they're different

12   sovereigns, but try telling that to a client who

13   existentially faces consequences in two fora and has to

14   sort through how those two cases interact.

15          I think that because the United States

16   government brought this charge, knowing full well that

17   there was a pending state court charge, the government or

18   its agent who testifies should be required to answer

19   questions about that decision.  What is their motive in

20   bringing this case?  What is their interest in the outcome

21   of this case?

22          For example, many state prosecutors will not

23   prosecute under the state possession of child pornography

24   law of film because it is an affirmative and complete

25   defense for possession of three or fewer images.

1    Connecticut prosecutors have thus far not adopted the

2    practice of regarding each frame in the film as a separate

3    image, so thus any one -- a one-second montage with 60

4    things could be 60 images.  Could it be that we're here

5    because the State wouldn't prosecute?  And could it be

6    that the State wouldn't prosecute because there was no

7    violation of the law?  You know, I think that's a factor

8    the jury could consider.  And I'll concede, Judge, that

9    it's related to my nullification claim, which we'll

10   address later.

11         But my view is the United States government is

12   no different than any other party when it walks into this

13   courtroom.  Its motives, its bias, its interest in the

14   outcome of the case can and should be probed, especially

15   in a case where there's a pending and sister state

16   prosecution arising from a common nucleus of operative

17   effect.

18         MR. PATEL:  Your Honor, we continue to move to

19   preclude any evidence of the government's motive or

20   reasons behind pursuing this prosecution.  That is not a

21   matter for the jury.  The jury is only supposed to

22   consider whether -- should only consider whether the

23   evidence presented at trial, the government has met its

24   burden of proof with respect to the elements.  This type

25   of argument and evidence is not relevant to whether the

1       government has met the elements of the offense.  It would

2       only invite jury confusion and jury nullification.  And at

3       the end of the day, jury nullification is something that

4       the Court is required to prevent.

5              There's lots of cases, situations where federal

6       government and state government pursue joint -- I don't

7       want to use "joint," but parallel criminal prosecutions

8       where the federal government -- in the child exploitation

9       context it's often the case where we, the federal

10      government, pursues charges based on the videotape or the

11      manufacturing of child pornography, and the State

12      prosecutes the underlying sexual assault, and that's what

13      happened here.  This case is no different than any other

14      case that we routinely do.  And the motives why the

15      federal government decides to do that is not a matter for

16      the jury.

17             MR. PATTIS:  Judge -- I'm sorry, my apologies.

18             I'm flabbergasted by that argument.  What rule

19      says that we can't question the government's motives?  I

20      mean, this is a two-party case, the United States v.

21      Yehudi Manzano.  Whatever he says, whatever a witness on

22      his behalf says, the government is going to be able to

23      challenge them for motive and bias and interest in the

24      outcome.  I fail to see any -- I've never seen a case that

25      suggested that the government, when it testifies through a

1    party, in this case the special agent, is exempt from

2    ordinary strictures of cross-examination.  And to suggest

3    somehow the government's motives remain opaque, that goes

4    well beyond -- well beyond a prohibition of jury

5    nullification.  That's basically saying the government is

6    entitled to special status in a criminal prosecution.  I'm

7    unaware of any case that says that as well.

8              THE COURT:  Well, okay.  When a witness takes

9    the stand, you can obviously cross him or her with any

10   evidence of bias, interest in the outcome, or whatever.

11   But what I understand you to be saying is that you're

12   questioning the U.S. Attorney's Office's decision to

13   prosecute this case, which I don't think is appropriate.

14   So --

15             MR. PATTIS:  Why wouldn't it be, Judge, in the

16   same way if you sued me civilly, I could cross-examine you

17   for your decision to bring the action against me and your

18   reasons for it.  Why is the defendant entitled to less

19   when his liberty is on the line as to the United States

20   government?

21             THE COURT:  Well, when I sue you, I'm a party.

22   Here the party is the United States.  It's not --

23             MR. PATTIS:  That's exactly right, and the

24   United States is a legal fiction.  I can't subpoena the

25   United States.  It frankly doesn't exist.

1              THE COURT:  Right.

2              MR. PATTIS:  It exists only through its agents.

3    I can't disqualify Mr. Patel and call him as a witness,

4    but he's got a government agent who's here, presumably

5    with the Court's permission, notwithstanding the

6    sequestration order.  That is the face of the government

7    for this case.

8              THE COURT:  That's right.  And when the

9    government agent takes the stand, you'll be permitted to

10   suggest that there's some bias, hostility, or whatever.

11   But you can't impute it to the United States.

12             MR. PATTIS:  She's here because she's a

13   representative of the United States.  She's the case agent

14   representing the United States.  I can't subpoena the

15   United States.  It doesn't exist.

16             THE COURT:  No, no.  And so you do it through

17   her.

18             MR. PATTIS:  Well, in my -- it may be that the

19   argument has run its course, and you've made your

20   decision.  I'll simply say the following:  I don't see why

21   that should be limited as to the government's motives, to

22   the degree she's aware of them, for bringing this

23   prosecution, and I believe she has had conversations with

24   the agents about that -- or with the prosecution about

25   that.  So my claim is that the government is not entitled

1    to special treatment here, much as any other party, and

2    because I can't subpoena the government because it,

3    strictly speaking, doesn't exist, I can only do so through

4    its agents.

5              THE COURT:  All right.  What's next?

6              MR. PATTIS:  I guess we'll take that on a

7    question-by-question basis.

8              With respect to the claim that I cannot

9    cross-examine the accuser in light of 18 U.S.C. 3509(k),

10   it's our view that that statute violates the Sixth

11   Amendment because it is never collateral to impeach a

12   witness with their interest in the outcome and their

13   motive.  This is a young woman who threatened legal

14   consequences if my client did not provide her with money.

15   He didn't.  Legal consequences arise.  She continues to

16   make statements about her financial income -- interest in

17   the outcome of this case, including her filing a statutory

18   claim that gives her a right, if she prevails in this

19   case, presumably this might have some -- some effect on

20   the civil litigation, a sum of $150,000.

21             So for Congress to say we're going to abandon

22   the Sixth Amendment in this context, we simply disagree

23   with that decision and ask you to so hold.  Apparently

24   there's no authority on this -- on this statute and this

25   challenge, so we're asking you to make that decision for

1   the first time.

2           MR. PATEL:  Your Honor, as I indicated the other

3   evening, we have researched this issue, and there is no

4   case law addressing this subsection of 3509, nor could we

5   locate any legislative history.  So all we have to rely on

6   is the statute itself, and we'll just defer to the Court.

7           THE COURT:  Well, I'm going to permit

8   cross-examination with respect to the civil lawsuit.  In

9   my view, it does violate the Sixth Amendment to preclude a

10  party from raising an obvious financial interest in the

11  outcome of the case.

12          MR. PATEL:  Just one concern, Your Honor, is

13  that in the civil case, the minor is represented by

14  counsel, and we would ask that defense counsel not be

15  permitted to inquire as to any communications that are

16  subject to the attorney-client privilege.

17          MR. PATTIS:  That's understood.

18          THE COURT:  Okay.

19          MR. PATTIS:  Next issue, Judge, is Number 5 on

20  whether the Court is going to consider giving a reasonable

21  mistake as to age charge.  Again, the Court heard some

22  discussion of that Thursday night.  I'm not sure more

23  needs to be said on that.

24          THE COURT:  Well, I would be willing to do that,

25  but consistent with the Ninth Circuit pattern

1    instructions, it's an affirmative defense that has to be

2    proven by clear and convincing evidence by the defendant.

3              MR. PATTIS:  So we will take an exception to

4    that portion of the charge because it's our view that the

5    burden of proof never slides to the defense side; that

6    consistent with how some states, at least, treat these

7    issues, the burden should go to the United States

8    government to disprove it beyond a reasonable doubt.

9              THE COURT:  Okay.  Well --

10             MR. PATTIS:  Understood.

11             MS. KARWAN:  Your Honor, along those lines, to

12   the extent -- I was assigned to argue this part of the

13   argument -- to the extent that Your Honor is concluding

14   that the affirmative defense is available under *United*

15   *States against District Court for Central District of*

16   *California,* and joining Judge Kozinski in that regard,

17   we'd note under the local rules I believe Attorney Pattis

18   would have an obligation to present any evidence he

19   intends to rely upon in such an affirmative defense.  It

20   should have been turned over within 14 days of discovery,

21   but we would ask for that now.

22             MR. PATTIS:  I'll provide the government with a

23   copy before I leave.

24             THE COURT:  All right.

25             MS. KARWAN:  And will the jury be instructed

1    that at the onset, Your Honor?

2              THE COURT:  In the preliminary instructions?

3              MS. KARWAN:  Yes, when Your Honor goes over the

4    charge and the three elements.

5              MR. PATTIS:  I would object to that.  It's

6    possible, depending on how the government's case comes in,

7    I may or may not pursue that if I'm persuaded that it's

8    unavailing.

9              MS. KARWAN:  Understood, Your Honor.

10             THE COURT:  That's fine.

11             MS. KARWAN:  We are taking exception, though,

12   just to preserve our objection, Your Honor.

13             THE COURT:  It's not necessary to do that, but

14   that's fine.

15             MS. KARWAN:  Just want to be clear for our

16   appellate folks.

17             MR. PATTIS:  If the Court is going to charge and

18   tell the jury that it can consider bases of liability that

19   do not depend on scienter, we will challenge the testimony

20   of the FBI forensic examiner, who, according to the

21   government's papers, quote, used, end quote, Cellebrite

22   forensic software.  I simply don't know -- I mean, I'm

23   aware of what Cellebrite is and I've seen cases in which

24   it's been used, but to permit the forensic examiner to

25   testify as an expert that he relied on the conclusions of

1    the Cellebrite entity or thing in reaching his conclusions

2    we believe violates my client's rights under

3    *Melendez-Diaz,* that is, the right to confront witnesses

4    against him.

5            The Cellebrite -- the product of the Cellebrite

6    forensic software will be the functional equivalent of

7    testimony, and although in a civil proceeding experts are

8    permitted to rely upon hearsay in reaching their

9    conclusions, this is a criminal proceeding in which

10   Mr. Manzano retains the right to confront the witnesses

11   against him.  We simply can't confront the black box.

12   There's no way to do that.  He is not a manufacturer, not

13   a manufacturer's representative.  He doesn't know the

14   algorithm or the software.  He simply knows that if he

15   behaves in a certain way with respect to the box, the box

16   is supposed to give him results that are generally

17   regarded or that he regards as valid.  That's not

18   cross-examination of the Cellebrite material or a person

19   who's competent or capable of discussing the manner and

20   means by which the Cellebrite operates.

21           So we would take the position that under

22   *Melendez-Diaz*, our Sixth Amendment right to confront

23   witnesses is abridged.  We didn't raise this earlier,

24   candidly, because we did not think the government was

25   proceeding on a non-mens rea or nonscienter basis in this

1    case, but we're aware of it now, and we would object to

2    any testimony in which he relies on functional equivalent

3    of a black box.

4              MR. PATEL:  Your Honor, all this Cellebrite

5    technology does is you take a cellphone, you hook up a

6    cord to the cellphone, and then the software copies the

7    data from the phone to the computer examiner's drive, and

8    then he can just review the data.  It's no different than

9    if I copy something from one computer and put it on a disk

10   and look at it.  I wouldn't need a forensic expert to just

11   copy contents from one drive to another and look at the

12   data.

13             And that's exactly what the Second Circuit said

14   in unpublished opinion in 2014 where it held that FBI

15   special agent, who was just testifying about how he used

16   Cellebrite to copy the data from the phone to his computer

17   and then look at it was not expert testimony.  That's why

18   we didn't notice him as an expert because he's just making

19   observations of the data that he copied from the

20   cellphone.

21             Now, on Thursday evening, based on the

22   defendant's objection, we said, Okay, we will -- we will

23   qualify him as an expert during trial.  But we still

24   maintain our position that his testimony is not expert

25   testimony.  He's just copying the contents from one

1    computer device to another.  The lay witness on the stand,

2    for example, someone who observes -- took photographs with

3    his phone of a crime scene and then copied it from his

4    phone to his computer drive, would we say that's an expert

5    because he just copied images from one device to another?

6    No.  It happens every day.  This person just used a

7    software that does it for cellphones.

8            MR. PATTIS:  Well, that's sort of like saying of

9    a DNA -- a DNA expert that when they are involved in the

10   copying of DNA, all they're doing is having the polymer

11   reaction, so that they're copying the underlying product.

12   But as the Court I'm sure is aware, that's actually a far

13   more complicated procedure.

14           Mr. Patel wants to say that this is like

15   authenticating a photograph.  And the way you authenticate

16   a photograph is you say that this photograph is a fair and

17   accurate representation of what it portrays.  Cellebrite

18   does more than that or Cellebrite wouldn't be offered.

19   Cellebrite aggregates and Cellebrite makes possible

20   analyses that are not possible from just looking at a

21   cellphone.  That's why it's used.  And the manner and

22   means by which it does that we would claim resembles the

23   multiplication of a strand of DNA.  And it's not simply a

24   question of saying, This is a fair and accurate

25   representation of what I saw on the cellphone.  If that's

1    all it were, they wouldn't use the Cellebrite.  They'd

2    just use the telephone.

3              THE COURT:  All right.  Well, I'm going to see

4    what foundation is laid at trial.

5              MR. PATTIS:  I think with respect to Issue 8,

6    sir, we addressed that in the 412 hearing in chambers.

7    The only issue that remains, Judge, is my request to be

8    permitted to argue nullification and to make the jury

9    aware of the sentencing consequences of a conviction.

10             THE COURT:  Well, just to be clear, 8, I'm going

11   to permit the history between the accuser and the

12   defendant, but not any other evidence of past history.

13             MR. PATTIS:  If I believe that the accuser opens

14   the door to an inquiry as to some third party, I'll ask

15   for permission to approach.  I mean, I understand your

16   ruling.  I have no intent to go after that or to seek to

17   manipulate her to produce it, Judge.

18             THE COURT:  All right.

19             MR. PATTIS:  As to 9, throughout the proceedings

20   on the eve of voir dire, and at the time of voir dire, and

21   at the time of the request to charge, and at our charge

22   conference I've made clear my belief that jury

23   nullification is the proper -- is the right -- that a jury

24   has a right to nullify, has not just the power to nullify

25   but the right to be shown how to use that power, and that

1    can come in a number of different forms.  It can come by

2    voir dire, and the Court rejected my voir dire request.

3    It can come by way of a charge.  It can come by way of

4    argument.  It can come by way of offering evidence as to

5    the sentencing consequences of a plea.

6              I don't want to be tedious and give a lengthy

7    recitation of at least my reading of American history, but

8    we pride ourselves on the role of juries in this country,

9    and indeed you'll recall that the Declaration of

10   Independence talked in part about defending the right to a

11   trial by jury, something that King George had abridged.

12             There is very little recent law on

13   nullification.  The government recites the *Thomas*

14   decision, I believe it is, about the right of a defendant

15   to seek a jury charge on nullification, and *Sparf*

16   precludes that.  The Supreme Court, however, has not ruled

17   on this since 1895.

18             Candidly, Judge, this is a situation in which

19   Mr. Manzano was involved in a consensual relationship, and

20   I understand consent is not relevant, but a non-coerced

21   relationship, which is I believe how the government

22   intends to refer to it, with a young woman, and at one

23   moment in time took a brief film, which he downloaded and

24   then sought to erase.  No one ever saw the film, other

25   than the government agents investigating this.  The film

1    was not distributed in interstate commerce.  At most, a

2    telephone that traveled through state lines was used.

3           This can't be justice.  A 15-year mandatory

4    minimum for this conduct, when a century ago that woman

5    would have been -- could lawfully have consented to sexual

6    intercourse in every jurisdiction in the United States?

7    It was only in the 1880s when the Women's Christian

8    Temperance Union began to wonder about the consequences of

9    urbanization that these laws of consent went up because

10   they were concerned about what was happening to factory

11   girls far from home.

12          This young woman was no innocent.  My client is

13   no saint.  But for the government to contend the jury

14   ought not to know what it's asking it to do in the name of

15   the people is to me obscene.  And the jury needs to

16   understand that this isolated act, if it believes that

17   this is the sort of interstate commerce that Congress

18   intended and it's comfortable with that, then go ahead and

19   convict.  If it thinks the government has misapplied a law

20   intended to effect a far different and more culpable

21   conduct, then I think they're entitled to know that.  If

22   they don't know the sentencing consequences, they can't if

23   they're not told that they have the power to nullify,

24   which even the government acknowledged they have in its

25   argument to you during voir dire.  If I'm not permitted to

1    let them know about that power in any form, then it's

2    really a nullity, and the jury becomes emasculated.

3         Juries exist for a reason.  They stand between

4    the government and the accused, and they provide the

5    accused with an opportunity to hold the government to its

6    burden of proof.  And in certain trials in our history,

7    juries have done more than that.  They've said the law is

8    wrong, and we, the people, say it's wrong.  A jury sits as

9    the consciousness of a community almost as an ad hoc

10   referendum on government conduct.  I'm unaware of any case

11   that said that cannot happen.  The only case from the

12   United States Supreme Court that I'm aware of said I'm not

13   entitled to a charge.  That case is a hundred thirty years

14   old.

15        You have seen on the bench the grotesque

16   misapplication of the commerce clause in our lifetime.

17   Prior to the 1930s and '40s it was rarely used in the

18   manner in which it's used now.  The United States Supreme

19   Court has twice had to roll back commerce clause

20   applications in the *Morrison* case, as to the gun-free

21   school zone -- or, excuse me, the Violence Against Women's

22   Act, and in the *Lopez* case as to the gun-free school zone

23   case.  This may be the third case, where an isolated act,

24   in a moment in time, is used to leverage the commerce

25   clause into a 15-year sentence.

1          Judge, this is just wrong.  I've been doing

2     this -- defending people accused of crimes for 25 years.

3     This is the first time I've walked into a court and felt

4     soiled by the process.  For me to stand by silently and

5     permit this to happen to Mr. Manzano and not to alert the

6     jury of what's really at stake in this case in my view is

7     a miscarriage of justice.  I'm asking you for permission

8     to let this jury know what's going on in this courtroom,

9     because if you don't, they won't.

10         And I'm reminded of a case years ago where I

11    defended a young man of murder.  He was convicted and

12    sentenced to 45 years.  When a juror read that sentence,

13    they called me the next day.  They read it in the

14    newspaper and said, angrily, "Why didn't you tell us what

15    could happen?"  And I said, "I didn't because the law

16    would not permit it."

17         I don't know if that would have changed that

18    juror's vote.  But I do know in this case, Judge,

19    Mr. Manzano is not necessarily going to deny what

20    happened, and that it was wrong, and that it hurt his

21    family and his children and himself, but 15 years for

22    this, Judge?  Is this interstate commerce truly?

23              MR. PATEL:  Your Honor, this has been briefed

24    extensively in our opposition to his motion to argue jury

25    nullification and the sentencing consequences and again in

1    our objection to the defense's proposed jury instructions

2    to argue jury nullification.  I don't want to rehash those

3    arguments again.  I think Your Honor is well aware of the

4    case law that says that the jury -- you should take steps

5    to prevent jury nullification and not inform the jury of

6    the sentencing consequences.  So we'll just rest on our

7    prior submissions, but we would ask for a ruling so that

8    we know that -- what's permitted and what's not permitted.

9         THE COURT:  This is a shocking case.  This is a

10   case that calls for jury nullification.  I have been told

11   by the Second Circuit that I cannot encourage jury

12   nullification, and I do not intend to encourage jury

13   nullification.  But I am absolutely stunned that this

14   case, with a 15-year mandatory minimum, has been brought

15   by the government.

16        I am going to be allowed no discretion at

17   sentencing to consider the seriousness of this conduct or

18   the lack of seriousness of this conduct, and it is

19   extremely unfortunate that the power of the government has

20   been used in this way, to what end I'm not sure.

21        So the law precludes me from charging the jury,

22   the law precludes me from encouraging the jury, and I

23   don't intend to do that.  But if evidence comes in about

24   the length of sentence, or if Mr. Pattis chooses to argue,

25   I do not feel that I can preclude that.  I don't feel I'm

```
 1    required to preclude that.  And I think justice requires
 2    that I permit that.  So it's not going to come from me,
 3    but I think justice cannot be done here if the jury is not
 4    informed, perhaps by Mr. Pattis, that that's the
 5    consequence here.
 6              MS. KARWAN:  Your Honor, may I inquire?
 7              THE COURT:  Yes.
 8              MS. KARWAN:  Is the Court going to instruct the
 9    jury, though, that it cannot consider the arguments of
10    counsel as relevant evidence, but only as arguments,
11    because if Mr. Pattis is informing them of something,
12    we're going to argue that there's no basis for them to
13    credit that.
14              THE COURT:  We'll have to see if it comes in
15    into evidence.
16              MS. KARWAN:  Meaning a question is asked,
17    allowed, and answer is given?
18              THE COURT:  Correct.
19              MS. KARWAN:  And the government would then ask
20    to seek the Court's permission to reopen its case to
21    introduce other evidence of Mr. Manzano's conduct that
22    would certainly come in as relevant sentencing -- relevant
23    conduct at sentencing under the 3553(a) factors, including
24    the length of the relationship, the fact of when it was
25    started, who was present in the house over the year and a
```

1    half, as well as Mr. Manzano's possession of weapons.

2              MR. PATTIS:  So there we go again, Judge.  His

3    motives are wide open, but the government gets to hide

4    behind the legal fiction.  It's just not right.

5              THE COURT:  I'm not sure I understand the

6    purpose of the offer.

7              MS. KARWAN:  Your Honor expressed some concern

8    about the sentence to be imposed, which would always be

9    driven by the 3553(a) factors.

10             THE COURT:  No, it's not.  It's driven by the

11   statute.  The statute says 15 years.  If he's done

12   anything to violate the statute, he gets 15 years; and

13   you, Judge, can't do anything about it.  That's what the

14   statute says.  It's not 3553(a), because 3553(a) we

15   wouldn't have a mandatory minimum.  We would have true

16   sentencing discretion, where you would present evidence

17   and Mr. Pattis would present evidence, and I would make a

18   decision based upon all of that evidence, all those

19   factors.  I don't get to do that in this case.

20             MS. KARWAN:  I understand, Your Honor.  At

21   sentencing we would still present evidence related to the

22   3553(a) factors, and --

23             THE COURT:  Why bother?

24             MS. KARWAN:  -- I think the Court would have to

25   consider.

1           THE COURT:  Why bother?

2           MS. KARWAN:  I understand Your Honor's

3   frustration with the mandatory minimum, but I think

4   3553(a) is still applicable.  Your Honor might conclude

5   that 15 years, the mandatory minimum is insufficient based

6   on relevant conduct.

7           THE COURT:  I can't imagine, I can't imagine

8   that's the case.

9           MS. KARWAN:  Your Honor, I can.  And I think a

10  case where --

11          THE COURT:  Well, it's a sentencing, it's a

12  sentencing issue at that point.

13          MS. KARWAN:  But Your Honor has indicated that

14  that sentence is inappropriate without knowing all of

15  those factors.  But the point is, that's not what we

16  involve the jury in.

17          If Your Honor thinks there's something wrong

18  with the statute, then the Court will proceed as follows,

19  but to argue about congressional intent and the propriety

20  of the statute seems to me opens the door as to the

21  propriety in this case, and that would call into question

22  relevant conduct of Mr. Manzano, which the government

23  is -- you know, so far indicated to Mr. Pattis that it's

24  going to stay away from because we want the jury to focus

25  on the elements of the offense.  But if we're going to be

1    focusing on a whole host of things, including

2    congressional intent behind this statutory mandatory

3    minimum, it seems like we should be considering all the

4    factors behind this particular offense.

5           THE COURT:  We're not going to talk about

6    congressional intent at this trial.  Mr. Pattis is simply

7    going to cross-examine somebody who's going to say what

8    the penalty is, mandatory minimum of 15 years.  That's

9    what's going to happen.  And then --

10          MS. KARWAN:  And if that person has personal

11   knowledge behind why that is the mandatory minimum, why

12   wouldn't we be able to ask them on redirect?

13          THE COURT:  It doesn't matter why.  We're not

14   going to get into legislative history here.  If you want

15   to say it's not really 15 years, it's really eight years,

16   or really five years, or really two years, go ahead.

17   That's fine.

18          MR. PATTIS:  What I hear the government saying

19   is one of them may want to testify about their charging

20   decision, and I'll let them select either one of them.

21   I'll be happy to cross-examine either prosecutor on their

22   charging decision in this case.

23          MS. KARWAN:  Your Honor, Mr. Pattis is offering

24   the mandatory minimum evidence, at least as I understand

25   it, to argue that it's inappropriate in this case.

1          THE COURT:  Yes.  He is.

2          MS. KARWAN:  So as I understand it, if that

3    question is asked and that evidence comes in, the

4    government on redirect should be allowed to ask the

5    witness in their view why it's appropriate in this case.

6          THE COURT:  If you challenge -- he's going to

7    simply bring out the consequence.  The consequence is if

8    you, ladies and gentlemen, return a verdict of guilty,

9    this gentleman is going to go to prison for 15 years.

10          If that's not correct, then, yes, you can bring

11    out on redirect how that isn't correct.

12          MS. KARWAN:  And then he's going to argue that

13    the jury should not follow the law as instructed by the

14    Court because the penalties are so high.

15          THE COURT:  Yes, he is.

16          MS. KARWAN:  And I guess I'm back to where I

17    started this question, if the Court is going to instruct

18    the jury that it has to follow the law and that the

19    arguments of counsel are not evidence.

20          THE COURT:  I'm going to --

21          MR. PATTIS:  That's a hybrid question, but I'll

22    stop.

23          THE COURT:  I intend to charge the jury that

24    sentencing is not their -- not their concern.

25          MS. KARWAN:  Okay.  Understood.  I mean, we

1   would still object, obviously, if the question is asked as

2   to the statutory penalty at the appropriate time, but the

3   Court is going to allow it.  You've noted our objection.

4           THE COURT:  I have.  So technically I'm denying

5   your motion, but --

6           MR. PATTIS:  Understood.

7           THE COURT:  What else?

8           MR. PATTIS:  That's it from the defense, sir.

9           MR. PATEL:  I don't believe there's any

10  outstanding issues, Your Honor.

11          THE COURT:  Okay.  So we're here at

12  9:00 tomorrow.  And did anybody have comments on the

13  preliminary jury instructions?

14          MR. PATEL:  Yes, Your Honor.  In light of what

15  the statute says, the preliminary instruction only notes

16  the one of the three alternative interstate elements.  It

17  doesn't list all three.

18          THE COURT:  It says "or otherwise affected

19  interstate commerce."  It's just --

20          MR. PATEL:  Yes, sir.

21          THE COURT:  -- I don't want to read that whole

22  long statute.

23          MR. PATEL:  That's fine, Your Honor.

24          MR. PATTIS:  No further comments, Judge.

25          THE COURT:  All right.  Thank you.  We'll stand

1    in recess.

2                (Proceedings adjourned at 11:51 a.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E


No. 3:18-cr-00095(SRU)
United States of America v. Yehudi Manzano


        I, Sharon L. Masse, RMR, CRR, Official Court

Reporter for the United States District Court for the

District of Connecticut, do hereby certify that the

foregoing pages are a true and accurate transcription of

my shorthand notes taken in the aforementioned matter to

the best of my skill and ability.



              October 29, 2018


              /S/ Sharon L. Masse
            Sharon L. Masse, RMR, CRR
             Official Court Reporter
             915 Lafayette Boulevard
          Bridgeport, Connecticut  06604
               Tel: (860)937-4177