MANDATE

Case 18-3430, Document 126-1, 02/07/2020, 2775851, Page1 of 31
Case 3:18-cr-00095-SRU   Document 81   Filed 02/07/20   Page 1 of 56

18-3430
*In re: United States of America*

# United States Court of Appeals
# for the Second Circuit

AUGUST TERM 2018

Docket No. 18-3430

IN RE: UNITED STATES OF AMERICA,

UNITED STATES OF AMERICA,

*Petitioner,*

*v.*

YEHUDI MANZANO,

*Respondent.*

ARGUED: FEBRUARY 13, 2019

DECIDED: DECEMBER 18, 2019

Before:        PARKER, CHIN, AND SULLIVAN, *Circuit Judges.*

On the eve of trial, the United States District Court for the District of
Connecticut (Underhill, *Chief Judge*) ruled that Respondent – who is charged with,

MANDATE ISSUED ON 02/07/2020

*inter alia*, production of child pornography, an offense punishable by a mandatory minimum term of fifteen years' imprisonment – could argue jury nullification at trial.  The district court also reserved decision on whether evidence of sentencing consequences would be admissible.  The government now petitions for a writ of mandamus directing the district court to preclude defense counsel from arguing nullification and to exclude any evidence of sentencing consequences.  We hold that the conditions for mandamus relief are satisfied with respect to the district court's nullification ruling, but not with respect to the admissibility of evidence of sentencing consequences.  Thus, we grant in part and deny in part the petition.

Judge Parker concurs in part and dissents in part in a separate opinion.

> SANDRA S. GLOVER, Assistant United States Attorney (Sarah P. Karwan, Neeraj Patel, Assistant United States Attorneys, *on the brief*), *for* John H. Durham, United States Attorney for the District of Connecticut, New Haven, CT, *for Petitioner*.
>
> NORMAN A. PATTIS, Pattis & Smith, LLC, New Haven, CT, *for Respondent*.
>
> JOHN GLEESON (Pooja A. Boisture, Nathan S. Richards, *on the brief*), Debevoise & Plimpton LLP, New York, NY, *for Amicus Curiae* The Honorable Stefan R. Underhill.
>
> Clark M. Neily III, Jay R. Schweikert, Cato Institute, Washington, D.C., *counsel of record*, Mary Price, FAMM Foundation, Washington, D.C., Peter Goldberger, Ardmore, PA, Joel B. Rudin, National Association of Criminal Defense Lawyers, New York, NY, *for Amici Curiae* Cato Institute, FAMM Foundation, and National Association of Criminal Defense Lawyers.

Timothy Lynch, The Fully Informed Jury
Association, Helena, MT, *for Amicus Curiae*
The Fully Informed Jury Association.

RICHARD J. SULLIVAN, *Circuit Judge*:

Respondent Yehudi Manzano stands charged with production of child
pornography, an offense punishable by a mandatory minimum term of fifteen
years' imprisonment, and transportation of child pornography, which is
punishable by a mandatory minimum term of five years' imprisonment. Shortly
before trial, he filed motions requesting permission to argue for jury nullification
– in essence, that the jury should render a verdict not in accordance with the law
– and to present evidence regarding the sentencing consequences of a conviction
in this case. On the eve of trial, the district court (Underhill, *Chief Judge*) granted
Manzano's request to argue jury nullification, but reserved decision on the
admissibility of evidence regarding the sentencing consequences of a conviction.

The government now seeks a writ of mandamus directing the district court
to (1) preclude defense counsel from arguing jury nullification, and (2) exclude any
evidence of sentencing consequences at trial. Applying settled law in this circuit,
we hold that the government has a clear and indisputable right to a writ directing
the district court to deny defense counsel's motion for leave to argue jury

3

nullification, and that the other conditions for mandamus relief are satisfied. We further hold that, at this time, the government does not possess a clear and indisputable right to a writ directing the district court to exclude any evidence of sentencing consequences.

Accordingly, we grant in part and deny in part the government's petition.

I. BACKGROUND

A. Facts[1]

In October 2016, law enforcement officers in Connecticut received information that a 15-year-old girl, M.M., had been in a sexual relationship with Yehudi Manzano, the 31-one-year-old landlord of the building where she lived. During the ensuing state investigation, officers searched Manzano's cell phone pursuant to a warrant and discovered a video of M.M. and Manzano engaged in sexually explicit conduct.

M.M. knew that Manzano was recording the video at the time, and Manzano did not threaten her or force her to engage in the sexual conduct. Nonetheless, M.M. was 15 years old when the video was recorded and therefore was incapable

---

[1] The following facts have not yet been admitted into evidence in the district court, but the parties do not dispute them for the limited purpose of our review of the government's petition.

4

of consenting to sexual conduct as a matter of law. *See* Conn. Gen. Stat. § 53a-71(a)(1).  Although Manzano did not distribute the video, he uploaded it, using internet servers located outside of Connecticut, to his personal Google Photos folder.

## B.  District Court Proceedings

In May 2018, a grand jury sitting in Connecticut returned an indictment charging Manzano with one count of production of child pornography, in violation of 18 U.S.C. § 2251(a), and one count of transportation of child pornography, in violation of 18 U.S.C. § 2252A(a)(1).  The production count is punishable by a mandatory minimum term of fifteen years' imprisonment, 18 U.S.C. § 2251(e), while the transportation count is punishable by a mandatory minimum term of five years' imprisonment, *id.* § 2252A(b)(1).  The district court set a trial date of October 29, 2018.

On October 1, 2018, Manzano filed a pretrial "Motion to Permit Counsel to Argue Jury Nullification" in which he sought "permission to make the jury aware of the penalty, and to argue that the [g]overnment's application of the law to the particular facts of this case is an obscene miscarriage of justice."  *United States v. Manzano*, No. 18-cr-95 (SRU) (D. Conn. Oct. 1, 2018), ECF No. ("Doc. No.") 30.  In

5

support of these requests, Manzano argued that "[b]ut for [M.M.'s] age, the contact was consensual," and "[b]ut for the fact that his telephone was seized pursuant to a warrant, no one would ever have had access to the film."  *Id.*  Manzano acknowledged that the government "may well be able to prove the elements of the [production] offense," but he insisted that "the conduct at issue here, while perhaps not innocent, [was] in no way so sinister as to warrant" the fifteen-year mandatory minimum penalty.  *Id.*

On October 11, 2018, the government filed its opposition to Manzano's motion and requested that defense counsel "be precluded, through a jury address, witness examination, or offer of evidence, from informing the jury about the sentencing consequences or suggesting to the jury that they may acquit if they find the [g]overnment's prosecution or the sentencing consequences are unjust."  Doc. No. 36 at 7.  The government renewed that request in its motions *in limine*, filed October 23, 2018, which sought "to preclude evidence and/or argument of the propriety of the [g]overnment's prosecution."  Doc. No. 45 at 9–10.

On October 25, 2018, with trial set to begin in four days, the district court held a pretrial conference at which it reserved decision on the government's motion.  The next day, Manzano requested that the court rule on his still pending

"request to argue jury nullification and to present evidence of the sentencing consequences of a conviction to the jury." Doc. No. 48 at 10.

On October 29, 2018, the day the trial was scheduled to begin, the district court held another pretrial conference at which it granted Manzano's motion to permit counsel to argue jury nullification, while reserving decision on the admissibility of evidence related to sentencing consequences. In explaining its ruling, the district court began by observing that "[t]his is a shocking case . . . that calls for jury nullification."[2] Doc. No. 60 at 34. The court then ruled:

> [T]he law precludes me from charging the jury, the law precludes me from encouraging the jury, and I don't intend to do that. But if evidence comes in about the length of sentence, or if [defense counsel] chooses to argue, I do not feel that I can preclude that. I don't feel I'm required to preclude that. And I think justice requires that I permit that. So it's not going to come from me, but I think justice cannot be done here if the jury is not informed, perhaps by [defense counsel], that that's the consequence here.

---

[2] More fully, the district court explained:

> This is a shocking case. This is a case that calls for jury nullification. . . . I am absolutely stunned that this case, with a 15-year mandatory minimum, has been brought by the government. . . . I am going to be allowed no discretion at sentencing to consider the seriousness of this conduct or the lack or seriousness of this conduct, and it is extremely unfortunate that the power of the government has been used in this way, to what end I'm not sure.

Doc. No. 60 at 34.

*Id.* at 34–35.  The district court memorialized its ruling in a minute entry stating that "[Manzano's] motion is granted to the extent it seeks permission to argue for jury nullification."  Doc. No. 58.

The government immediately filed an emergency motion to adjourn the trial while it sought permission from the Solicitor General's Office to file a petition for writ of mandamus in this court.  At an emergency motion hearing held the same day, the district court granted the government's motion, dismissed the jury, and adjourned the trial pending our resolution of the government's petition.  With respect to its jury nullification ruling, the district court also reiterated:  "I simply am allowing [defense counsel] to argue as he chooses to argue.  There is no doubt that juries have the power to nullify, and [defense counsel] intends to argue that they should."  Doc. No. 62 at 4–5.

This petition for a writ of mandamus followed.

## II. DISCUSSION

The common-law writ of mandamus is codified in the All Writs Act, which provides that federal courts "may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a); *Cheney v. U.S. Dist. Court*, 542 U.S. 367, 380 (2004).  "The

traditional use of the writ in aid of appellate jurisdiction both at common law and in the federal courts has been to confine [the court against which mandamus is sought] to a lawful exercise of its prescribed jurisdiction." *Cheney*, 542 U.S. at 380 (alteration in original) (quoting *Roche v. Evaporated Milk Ass'n*, 319 U.S. 21, 26 (1943)). Although courts have not subscribed to a "technical definition of 'jurisdiction,'" it is common ground that mandamus may lie only in "exceptional circumstances amounting to a judicial usurpation of power or a clear abuse of discretion." *Id.* (internal quotation marks and citations omitted).

"The writ is, of course, to be used sparingly." *Stein v. KPMG, LLP*, 486 F.3d 753, 760 (2d Cir. 2007). Thus, three demanding conditions must be satisfied before the writ may issue: (1) the petitioner must "have no other adequate means to attain the relief [it] desires;" (2) the petitioner must satisfy "the burden of showing that [its] right to issuance of the writ is clear and indisputable;" and (3) the issuing court "must be satisfied that the writ is appropriate under the circumstances." *Cheney*, 542 U.S. at 380–81 (internal quotation marks and citations omitted).

Here, the government petitions for a writ of mandamus directing the district court to (1) preclude defense counsel from arguing jury nullification at trial, and

9

(2) exclude any evidence regarding the applicable mandatory minimum sentences. Applying the framework set forth in *Cheney*, we consider each claim in turn.

### A. Jury Nullification

#### 1. Other Adequate Means to Obtain the Relief Sought

To satisfy the first *Cheney* condition, a petitioner must show that it "ha[s] no other adequate means to attain the relief [it] desires." *Id.* at 380. This requirement is generally unsatisfied where (1) the district court has not yet foreclosed the relief sought in the petition, *see Kerr v. U.S. Dist. Court*, 426 U.S. 394, 404–06 (1976); *see also, e.g.*, *Philip Morris Inc. v. Nat'l Asbestos Workers Med. Fund*, 214 F.3d 132, 135 (2d Cir. 2000) (per curiam), or (2) the petitioner can obtain relief through the regular appeals process, *see Cheney*, 542 U.S. at 380–81.

Appearing as *amicus*, Judge Underhill contends that his ruling permitting defense counsel to argue jury nullification did "'not foreclose' the relief the [g]overnment seeks" because it was contingent on later rulings of the court. Brief of the Honorable Stefan R. Underhill as *Amicus Curiae* at 14 (quoting *Kerr*, 426 U.S. at 404); *see also, e.g.*, *In re Cohn*, 416 F.2d 440, 441 (2d Cir. 1969) (per curiam) (denying a petition for writ of mandamus where it was "clear that the district judge, in denying the application for adjournment [of trial], d[id] not view his

10

action as being final").  In particular, Judge Underhill argues that his ruling was contingent on whether evidence of the applicable mandatory minimums would later be ruled admissible at trial.  We are not persuaded.

As an initial matter, Manzano did not seek permission to argue jury nullification only in the event he could introduce evidence of the mandatory minimums at trial.  Rather, he filed a pretrial "Motion to Permit Counsel to Argue Jury Nullification," which sought the court's permission "both to inform the jury of the consequences of a conviction, and to argue to the jury that the law as applied [to] the particular facts of this case is . . . fundamentally unfair."  Doc. No. 30 at 2.  Likewise, the government's request to preclude defense counsel from arguing jury nullification was not predicated on the admissibility of evidence.  In its opposition to Manzano's motion, the government requested that counsel be precluded from arguing jury nullification "through a jury address, witness examination, or offer of evidence."  Doc. No. 36 at 7.  The government's motions *in limine* similarly sought "to preclude evidence *and/or argument* of the propriety of the [g]overnment's prosecution."  Doc. No. 45 at 9–10 (emphasis added).

The district court granted Manzano's motion and denied the government's corresponding request and motion *in limine* without any relevant qualification.

11

Although the district court recognized that evidence of the mandatory minimums was *a* basis for defense counsel's jury nullification argument, the district court did not limit its ruling to that basis. Rather, the district court ruled: "If evidence comes in about the length of sentence, *or if [defense counsel] chooses to argue*, I do not feel that I can preclude that. . . . And I think justice requires that I permit that." Doc. No. 60 at 34–35 (emphasis added). Consistent with this unambiguous statement, the district court memorialized its ruling in a minute entry that stated clearly and without any qualification that "[Manzano's] motion is granted to the extent it seeks permission to argue for jury nullification."[3] Doc. No. 58. On this record, there can be no doubt that the district court granted defense counsel's request to argue jury

---

[3] Our dissenting colleague points to the district court's remark, made at a hearing held later the same day, that if "evidence of the mandatory minimum[s] . . . comes in as a matter of trial evidence, [defense counsel] is permitted to argue from that to the jury." Doc. No. 62 at 6–7. That statement, however, came only after the district court had already ruled, and in any event, it was consistent with the court's earlier observation that evidence of the mandatory minimums was one way in which defense counsel might attempt to argue nullification. Moreover, in the same hearing, the district court also stated that it was "simply allowing [defense counsel] to argue as he chooses to argue," while recognizing that "juries have the power to nullify, and [defense counsel] intends to argue that they should." *Id.* at 4–5.

The dissent also relies in part on arguments advanced by Judge Underhill as *amicus*. Dissenting Op. at 16. While we have given due consideration to these arguments, which Judge Underhill permissibly raised through counsel in this mandamus proceeding, *see Ligon v. City of New York*, 736 F.3d 166, 171 & n.11 (2d Cir. 2013), ultimately we must ground our assessment of the proceedings below in the record rather than the parties' briefs, *see, e.g., Cross & Cross Properties, Ltd. v. Everett Allied Co.*, 886 F.2d 497, 505 (2d Cir. 1989).

nullification at trial, and that such a ruling was not contingent on later evidentiary rulings of the court.

We also conclude that the ordinary appeals process would not afford the government an adequate means of obtaining the relief it seeks. *See Cheney*, 542 U.S. at 380–81. The regular appeals process will be unavailable to the government if Manzano prevails at trial, because double jeopardy will have attached and the government will not be able to appeal the jury's verdict of acquittal. *See* U.S. Const. amend. V; 18 U.S.C. § 3731; *see also, e.g.*, *United States v. Amante*, 418 F.3d 220, 222 (2d Cir. 2005). Conversely, "if the government were to secure a conviction, any appeal would be moot and any alleged error would necessarily be harmless." *Amante*, 418 F.3d at 222. It is true, of course, that mandamus may not be invoked as a "substitute" for an interlocutory appeal – an uncontroversial rule that is made no "less compelling by the fact that the [g]overnment has no later right to appeal." *Will v. United States*, 389 U.S. 90, 97 (1967) (internal quotation marks, citation, and ellipses omitted). Our precedents make it abundantly clear, however, that the government's limited right of appeal in criminal cases is relevant to the mandamus inquiry. *See, e.g.*, *Amante*, 418 F.3d at 222; *In re United States*, 903 F.2d 88, 89 (2d Cir. 1990); *see also United States v. Sam Goody, Inc.*, 675 F.2d 17, 25 (2d Cir. 1982)

(discussing the rule stated in *Will* and recognizing that "[t]he writ thus is not to be granted *merely* because it is the only way in which the district court's new-trial order might be reviewed" (emphasis added)), *superseded by statute on other grounds as stated in United States v. Hundley*, 858 F.2d 58 (2d Cir. 1988); *United States v. Weinstein*, 511 F.2d 622, 627 (2d Cir. 1975) (granting a petition for writ of mandamus in part due to the "risk that the [g]overnment might be precluded on double jeopardy grounds from appealing"). Thus, the first *Cheney* condition is plainly satisfied. *See Amante*, 418 F.3d at 222; *In re United States*, 903 F.2d at 89.

## 2. "Clear and Indisputable" Right to the Writ

The second *Cheney* condition requires that a petitioner's "right to issuance of the writ [be] 'clear and indisputable.'" 542 U.S. at 381 (quoting *Kerr*, 426 U.S. at 403). This condition is satisfied where a district court commits "a clear and indisputable abuse of its discretion," that is, where the court clearly and indisputably "base[s] its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence, or . . . render[s] a decision that cannot be located within the range of permissible decisions." *Linde v. Arab Bank, PLC*, 706 F.3d 92, 107 (2d Cir. 2013) (quoting *SEC v. Rajaratnam*, 622 F.3d 159, 171 (2d Cir. 2010)).

14

We focus here on the first form of abuse of discretion – a ruling based on an erroneous view of the law.  The government contends that the district court clearly and indisputably based its ruling on the erroneous legal view that a defendant may, in certain circumstances, argue jury nullification.  Manzano responds that the government's right to a writ of mandamus is not clear and indisputable because no binding authority specifically prevents a district court from allowing counsel to argue jury nullification.  The necessary implication of Manzano's argument is that district courts have the discretion to allow jury nullification arguments in certain cases, and that the district court's ruling in this case was not clearly outside the "range of permissible decisions."  *Id.*

Manzano's argument misperceives our mandamus standard.  We have never required petitioners to point to binding authority directly on point in order to establish their entitlement to the writ.  *See, e.g., Stein*, 486 F.3d at 760.  Indeed, imposing such a requirement would mean casting aside one of the "touchstones" of mandamus review – the "presence of an issue of first impression."  *Amante*, 418 F.3d at 222; *see also Schlagenhauf v. Holder*, 379 U.S. 104, 111 (1964) (concluding that the Court of Appeals should have exercised its mandamus power over "issues of first impression" in order "to settle new and important problems"); *infra* at 22.

15

Thus, in determining whether a district court has clearly and indisputably

based its ruling on a legal error, we do not confine our review to the narrow (and

often empty) universe of binding cases directly on point.  *See, e.g.*, *In re City of New*

*York*, 607 F.3d 923, 947 (2d Cir. 2010).  Instead, as in any case, we may consider all

relevant legal authorities.  *See, e.g.*, *id.*; *see also, e.g.*, *San Jose Mercury News, Inc. v.*

*U.S. Dist. Court*, 187 F.3d 1096, 1102 (9th Cir. 1999) ("While we have never squarely

[answered the question presented in this mandamus petition], we conclude that

the unbroken string of [analogous and out-of-circuit] authorities . . . leaves little

doubt as to the answer.").  The ultimate question is simply whether, bearing in

mind the exceptional nature of mandamus, we are left with the "firm conviction"

that the district court's view of the law was incorrect.[4]  *In re Int'l Bus. Machines*

*Corp.*, 687 F.2d 591, 600 (2d Cir. 1982); *see also In re Cement Antitrust Litig. (MDL No.*

*296)*, 688 F.2d 1297, 1305–07, 1306 n.6 (9th Cir. 1982) (adopting the "firm

---

[4] The dissent labels this formulation of the "clear and indisputable" requirement as "entirely ad hoc," "generat[ing] chaos," and amounting to no "justiciable standard."  Dissenting Op. at 20–21. But courts routinely apply this formulation in the mandamus context, *see, e.g.*, *In re Int'l Bus. Machines Corp.*, 687 F.2d 591, 600 (2d Cir. 1982); *see also, e.g.*, *In re Bryant*, 745 F. App'x 215, 220 (5th Cir. 2018); *In re United States*, 884 F.3d 830, 836–37 (9th Cir. 2018); *Waymo LLC v. Uber Techs., Inc.*, 870 F.3d 1350, 1359 (Fed. Cir. 2017); *John B. v. Goetz*, 531 F.3d 448, 459 (6th Cir. 2008), and of course this formulation of the clear-error standard has been ubiquitous in the context of appellate review of factual findings since the Supreme Court first articulated it in *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948); *see also, e.g.*, *United States v. Simmons*, 661 F.3d 151, 155 (2d Cir. 2011) ("In order to [reverse for clear error], we must be left with the definite and firm conviction that a mistake has been committed." (internal quotation marks and citation omitted)).

conviction" standard for clear legal error in the mandamus context (citing *Int'l Bus. Machines*, 687 F.2d at 599–603)), *aff'd by an equally divided court sub nom. Arizona v. U.S. Dist. Court*, 459 U.S. 1191 (1983).

In this case, we are left with the firm conviction that the district court based its jury nullification ruling on an erroneous view of the law.  Our case law is clear: "it is not the proper role of courts to encourage nullification."  *United States v. Polouizzi*, 564 F.3d 142, 162–63 (2d Cir. 2009).  Rather, "the power of juries to 'nullify' or exercise a power of lenity is just that – a power; it is by no means a right or something that a judge should encourage or permit if it is within his authority to prevent."  *United States v. Thomas*, 116 F.3d 606, 615 (2d Cir. 1997).

Here, the district court in fact recognized that our case law "preclude[d] it from encouraging the jury" to nullify, Doc. No. 60 at 34, but then proceeded to draw an arbitrary distinction between encouraging the jury via jury instructions – which it properly deemed impermissible – and granting defense counsel's motion to argue nullification.  This distinction is unsupported by our case law.

In *Thomas*, we concluded that "a presiding judge possesses both the responsibility and the authority to dismiss a juror whose refusal or unwillingness to follow the applicable law becomes known to the judge during the course of

trial." 116 F.3d at 617. In reaching that conclusion, we explained in no uncertain

terms that "trial courts have the duty to forestall or prevent" jury nullification. *Id.*

at 616. Our reasoning was thus not limited to the specific facts at issue. Instead,

"tak[ing] th[e] occasion to restate some basic principles regarding the character of

our jury system," we "categorically reject[ed] the idea that, in a society committed

to the rule of law, jury nullification is desirable or that courts may permit it to occur

when it is within their authority to prevent." *Id.* at 614. We have since applied the

principles set forth in *Thomas* beyond the specific circumstances of that case, *see,*

*e.g.*, *Polouizzi*, 564 F.3d at 162–63; *United States v. Carr*, 424 F.3d 213, 219–21 (2d Cir.

2005); *United States v. Pabon-Cruz*, 391 F.3d 86, 95 (2d Cir. 2004), and we have no

hesitation doing so again here.

Applying the principles enunciated in *Thomas*, we emphatically reject the

rule, advanced by Judge Underhill as *amicus*, that district courts are free to permit

jury nullification arguments whenever they feel justice so requires – in other

words, in any case in which the court strongly disagrees with the government's

charging decisions and the attendant sentencing consequences. As a practical

matter, there is no meaningful difference between a court's knowing failure to

remove a juror intent on nullification, a court's instruction to the jury that

encourages nullification, and a court's ruling that affirmatively permits counsel to argue nullification.  In each of these situations, the conduct in question subverts the jury's solemn duty to "take the law from the court, and apply that law to the facts of the case as they find them to be from the evidence."  *Sparf v. United States*, 156 U.S. 51, 102 (1895); *see United States v. Trujillo*, 714 F.2d 102, 106 (11th Cir. 1983) ("We therefore join with those courts which hold that defense counsel may not argue jury nullification during closing argument."); *see also, e.g.*, *United States v. Gonzalez-Perez*, 778 F.3d 3, 18–19 (1st Cir. 2015); *United States v. Dougherty*, 473 F.2d 1113, 1130–37 (D.C. Cir. 1972).  District courts have a duty to forestall or prevent such conduct, *see Thomas*, 116 F.3d at 616, and the district court in this case abdicated its duty by ruling that defense counsel could argue jury nullification.[5]

We have no doubt that in granting Manzano's motion to argue for jury nullification, Judge Underhill was acting under the sincere belief that his ruling was consistent with, and perhaps mandated by, the ends of justice.  Nevertheless, individual judges, cloaked with the authority granted by Article III of the Constitution, are not at liberty to impose their personal view of a just result in the

---

[5]  Indeed, Judge Underhill's statements that he thought this case "calls for jury nullification," and that "justice cannot be done here if the jury is not informed, perhaps by [defense counsel]," of the sentencing consequences, Doc. No. 60 at 34–35, suggest not simply a ruling that actively permits nullification, but literal encouragement of jury nullification.

face of a contrary rule of law.  *See Hart v. Massanari*, 266 F.3d 1155, 1171, 1175 (9th Cir. 2001) ("Judges of the inferior courts may voice their criticisms [of a law], but follow it they must. . . .  A district court bound by circuit authority, for example, has no choice but to follow it, even if convinced that such authority was wrongly decided."); *see also Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1384 (2015) ("[O]nce a case or controversy properly comes before a court, judges are bound by federal law.").  Nor are judges prosecutorial gatekeepers who may override the government's constitutional exercise of charging discretion in the name of justice.  *See United States v. Batchelder*, 442 U.S. 114, 124 (1979); *United States v. Lovasco*, 431 U.S. 783, 790 (1977).  Contrary to the dissent's suggestion, the fact that we might disagree with the government's charging decision, or lack a full understanding of that decision, provides no basis for holding this matter in abeyance and remanding so that the prosecutors can "revisit their charging decision" or "provide information as to why they believed their decision was appropriate."  Dissenting Op. at 1.  Subject to narrow exceptions not implicated here, "so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his

discretion." *United States v. Armstrong*, 517 U.S. 456, 464 (1996); *see also, e.g., United States v. Ng*, 699 F.2d 63, 68 (2d Cir. 1983) ("Although one may reasonably disagree with the [government's] judgment in the matter, the evaluation of charges clearly rested within [its] prosecutorial discretion.").

Finally, the district court's ruling may not be upheld on the basis of its supervisory power "to oversee the administration of criminal justice within federal courts." *United States v. Johnson*, 221 F.3d 83, 96 (2d Cir. 2000). As the Supreme Court has held, "the supervisory power does not extend so far" as to "confer on the judiciary discretionary power to disregard the considered limitations of the law it is charged with enforcing." *United States v. Payner*, 447 U.S. 727, 737 (1980); *see also United States v. Myers*, 692 F.2d 823, 847 (2d Cir. 1982) ("[Supervisory power] has not been used as a general corrective authority over the conduct of criminal investigations, and, in light of *Payner*, its scope is surely not to be expanded."). Clearly, then, the supervisory power does not authorize a court to grant a defendant's request to argue that the jury should disregard the law.

For these reasons, we are firmly convinced that the district court's jury nullification ruling was based on an erroneous view of the law.[6] Accordingly, the

---

[6] In so concluding, we have no occasion to pass on whether, or to what extent, a district court must *sua sponte* police a lawyer's arguments to the jury that sound in nullification.

government has a clear and indisputable right to a writ of mandamus directing the district court to deny defense counsel's request for leave to argue nullification.

### 3. Appropriateness of Mandamus under the Circumstances

The third and final *Cheney* condition requires us to determine whether "the writ is appropriate under the circumstances." *Cheney*, 542 U.S. at 381. "This requirement recognizes that 'issuance of the writ is in large part a matter of discretion with the court to which the petition is addressed.'" *Linde*, 706 F.3d at 108 (quoting *Kerr*, 426 U.S. at 403). In exercising this discretion, we may "consider a range of factors, including whether the petition presents a 'novel and significant question of law' . . . [or] 'a legal issue whose resolution will aid in the administration of justice.'" *Id.* (quoting *In re City of New York*, 607 F.3d at 939).

We have little trouble concluding that mandamus is appropriate here. The specific question of whether a district court may actively permit a defendant to argue jury nullification is novel and significant in this circuit. Furthermore, resolving this issue will aid in the administration of justice. Obviously, our decision will serve to guide district courts in any criminal case in which a defendant requests leave to argue jury nullification or the government moves to preclude such argument. But more generally, today we reaffirm a principle of

22

fundamental importance in our jury system: namely, that the role of the court is to ensure, to the extent possible, that justice is done in accordance with the law – not in derogation of it. This principle is worthy of our mandamus jurisdiction.

Because the government has satisfied all three *Cheney* conditions, we grant the government's petition for a writ of mandamus directing the district court to vacate its prior order and to deny defense counsel's request for leave to argue jury nullification at trial.

## B. Evidence of Mandatory Minimum Sentences

The government also seeks a writ of mandamus directing the district court to bar the admission of any evidence related to the sentencing consequences that would result from Manzano's convictions. With respect to this form of mandamus relief, we conclude that the *Cheney* conditions are not satisfied at this time.

### 1. Other Adequate Means to Obtain the Relief Sought

As for the first *Cheney* condition, the government arguably has other means short of mandamus to preclude the introduction of the statutory mandatory minimums, since the district court has yet to rule on the admissibility of such evidence. *See Kerr*, 426 U.S. at 404–06; *see also, e.g.*, *In re United States*, 884 F.3d 830, 838 (9th Cir. 2018); *Philip Morris Inc.*, 214 F.3d at 135. In contrast to the district

23

court's ruling that defense counsel would be permitted to argue for jury
nullification at trial, the district court consistently manifested its intent to defer
ruling on the admissibility of evidence related to sentencing consequences until
after the commencement of trial.  When ruling on Manzano's request to argue jury
nullification, the district court observed that one way in which Manzano could
argue nullification was through evidence related to sentencing consequences "*if*
[such] evidence comes in."  Doc. No. 60 at 34 (emphasis added).  Similarly, at the
October 29, 2018 emergency motion hearing, the district court again recognized
that evidence of sentencing consequences could support Manzano's jury
nullification arguments "if that evidence comes in as a matter of trial evidence."
Doc. No. 62 at 6.  Thus, the district court has not yet ruled out the possibility that
evidence related to sentencing consequences will be precluded at trial.

Of course, insofar as the government's petition specifically seeks a *pretrial*
evidentiary ruling precluding evidence of sentencing consequences, mandamus
now would be the only means by which the government could obtain such relief,
since the district court expressly deferred its ruling until after the commencement
of trial.  Nevertheless, even assuming that the government has preserved a specific

24

request for pretrial relief, we conclude that the government's right to the writ is not clear and indisputable for the reasons set forth below.

## 2.  "Clear and Indisputable" Right to the Writ

In general, a mandamus petitioner challenging a district court's discretionary ruling faces a particularly daunting task.  As we have explained, a petitioner may satisfy the second *Cheney* condition by demonstrating that the district court clearly and indisputably abused its discretion in rendering a decision that is well outside "the range of permissible decisions."  *Linde*, 706 F.3d at 107 (quoting *Rajaratnam*, 622 F.3d at 171).  However, the more discretion the district court enjoys in a given area, the greater the range of permissible decisions, and thus the less likely it will be that any abuse of discretion is "clear and indisputable."  *See Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36 (1980) (per curiam) ("Where a matter is committed to discretion, it cannot be said that a litigant's right to a particular result is 'clear and indisputable.'"); *UAW v. Nat'l Caucus of Labor Comms.*, 525 F.2d 323, 326 (2d Cir. 1975) ("As to orders which lie within the discretion of the district judge[,] it is settled law in this Circuit that mandamus will not – indeed, may not – be issued except in the most extraordinary circumstances.").

In this case, by seeking a writ of a mandamus directing the district court to issue a pretrial ruling precluding any evidence of sentencing consequences at trial, the government necessarily challenges not one, but two discretionary decisions: (1) the district court's decision regarding *when* to rule on pretrial evidentiary motions, and (2) its decision regarding *how* to rule on the merits of those motions.

As for *when* an evidentiary ruling must be made, district courts enjoy broad discretion to defer ruling on a pretrial motion for "good cause." Fed. R. Crim. P. 12(d); *see also United States v. Barletta*, 644 F.2d 50, 57–59 (1st Cir. 1981). A district court may defer ruling where, for example, the resolution of a pretrial motion might depend in part upon evidence to be introduced at trial. *See United States v. Shortt Accountancy Corp.*, 785 F.2d 1448, 1453 (9th Cir. 1986); *Barletta*, 644 F.2d at 57–59; *see also, e.g., United States v. Williams*, 644 F.2d 950, 952–53 (2d Cir. 1981). Similarly, with respect to the merits of an evidentiary ruling, district courts "enjoy considerable discretion to decide evidentiary issues" within the bounds of the Federal Rules of Evidence. *United States v. Gabinskaya*, 829 F.3d 127, 134 (2d Cir. 2016); *see also United States v. Coppola*, 671 F.3d 220, 244 (2d Cir. 2012) ("The standard of review applicable to [an appellant's] Rule 401/403 challenge is highly deferential in recognition of the district court's superior position to assess

relevancy and to weigh the probative value of evidence against its potential for unfair prejudice." (internal quotation marks and citation omitted)).

The government attempts to cut through these layers of discretion by arguing, in essence, that the district court committed clear legal error (and thus a clear abuse of discretion) by failing to preclude evidence of the mandatory minimum sentences, which will be offered solely for the improper purpose of encouraging nullification. If we were confident in the premise that evidence of sentencing consequences will be offered solely for that improper purpose, we would agree that the district court clearly erred in failing to preclude such evidence, even at the pretrial stage. As the government correctly argues, there is no difference between improperly permitting defense counsel to argue nullification and admitting evidence for the sole purpose of encouraging nullification. *See United States v. Funches*, 135 F.3d 1405, 1409 (11th Cir. 1998) ("Because the jury enjoys no right to nullify criminal laws, and the defendant enjoys a right to neither a nullification instruction nor a nullification argument to the jury, the potential for nullification is no basis for admitting otherwise irrelevant evidence."). Evidence admitted solely to encourage nullification is by definition irrelevant, and thus inadmissible, regardless of what other evidence might be

27

introduced at trial. *See* Fed. R. Evid. 401–02; *Shannon v. United States*, 512 U.S. 573, 579 (1994).

On the sparse pretrial record in this case, however, it is not clear whether Manzano will seek to introduce evidence of sentencing consequences solely for the purpose of encouraging nullification. Indeed, at oral argument, defense counsel proffered an additional purpose for such evidence. Specifically, counsel stated that he may offer as impeachment evidence M.M.'s purported Facebook post of the government's press release setting forth the mandatory minimums for the purpose of showing M.M.'s bias or improper motive. In that event, given that there is no "absolute prohibition" on exposing the jury to sentencing consequences, *Shannon*, 512 U.S. at 588; *see also Polouizzi*, 564 F.3d at 161, the district court would need to assess whether the alleged impeachment evidence is relevant based on how the trial unfolds (e.g., whether M.M. testifies and the nature of her testimony), and, if it is, whether it passes muster under Rule 403, *see, e.g., United States v. DiMarzo*, 80 F.3d 656, 660 (1st Cir. 1996).

Thus, we cannot rule out the possibility that the admissibility of sentencing consequences will depend at least in part on events that will unfold at trial. In these circumstances, the district court's decision to defer ruling on the

28

admissibility of sentencing consequences until after the commencement of trial was not clearly and indisputably outside the range of permissible decisions. *See Barletta*, 644 F.2d at 57–59; *Shortt Accountancy Corp.*, 785 F.2d at 1453. Because the district court's decision therefore did not constitute a clear and indisputable abuse of discretion, the second *Cheney* condition is not satisfied.

Lest our decision be misunderstood, however, we must emphasize two important points. First, if the district court finds that Manzano is indeed seeking to introduce evidence of sentencing consequences solely for the purpose of encouraging nullification, the court must exclude that evidence as irrelevant. *See supra* at 27–28. Second, by concluding that the demanding mandamus standard has not been satisfied on the pretrial record here, we do not thereby endorse a rule that evidence of sentencing consequences is generally admissible under Rule 403. In this context, a district court's discretion should be guided by the special considerations referenced in *Shannon* – namely, that evidence of sentencing consequences "invites [jurors] to ponder matters that are not within their province, distracts them from their factfinding responsibilities, and creates a strong possibility of confusion." 512 U.S. at 579; *see also, e.g., DiMarzo*, 80 F.3d at 660 (concluding that even if evidence of a "guideline sentencing range had some

29

minimal probative value," the district court did not err in excluding it "given the considerations alluded to in *Shannon*" (citing Fed. R. Evid. 403)).

At this time, however, we do not undertake to define the rare circumstances in which evidence of sentencing consequences might pass muster under Rule 403. Nor do we offer any opinion on whether those circumstances might present themselves during the trial in this case. Rather, we simply hold that, on the pretrial record here, the government has failed to demonstrate its clear and indisputable right to the writ as required by the second *Cheney* condition.

Accordingly, we deny the government's petition for a writ of mandamus directing the district court to preclude the introduction at trial of any evidence related to sentencing consequences, without prejudice to renewal following the district court's ultimate ruling on the motion to preclude. Because our familiarity with the procedural history and issues in this case will allow us to respond expeditiously to any future petition during trial, this panel will retain jurisdiction over any future petition in this case related to the admissibility of the sentencing consequences of a conviction or, more generally, jury nullification. *See, e.g., Philip Morris Inc.*, 214 F.3d at 135–36.

## III. CONCLUSION

The jury remains today, as it has been for centuries, "a central foundation of our justice system and our democracy." *Peña-Rodriguez v. Colorado*, 137 S. Ct. 855, 860 (2017). For our system to work, the court and the jury must work as partners to ensure that justice is done in accordance with the law. Of course, jurists and laypersons alike may disagree over whether justice and the law align in a given case. It is paramount, however, that in a society committed to the rule of law courts may not encourage or actively permit juries to ignore the law in the name of justice. *See Sparf*, 156 U.S. at 102; *Thomas*, 116 F.3d at 614; *Dougherty*, 473 F.2d at 1133–34; *United States v. Simpson*, 460 F.2d 515, 519–20 (9th Cir. 1972).

For the foregoing reasons, the petition for a writ of mandamus directing the district court to deny defense counsel's request for leave to argue jury nullification is GRANTED. The petition for a writ of mandamus directing the district court to exclude any evidence related to sentencing consequences is DENIED. The district court is hereby instructed to lift the stay of trial proceedings.

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

31

BARRINGTON D. PARKER, *Circuit Judge*, concurring in part and dissenting in part:

We are fortunate that the prosecutors in this Circuit nearly always bring a high degree of professionalism, good judgment, and common sense to bear in the exercise of their responsibilities. This case presents the unusual circumstance where a conscientious jurist is confronted with a charging decision that, in his considered judgment, reflects an abuse of prosecutorial power. Charging decisions are, of course, by and large the exclusive province of prosecutors.

There is a straightforward solution that could avoid the problems raised by the petition and discussed in this dissent. The petition should be held in abeyance and the case remanded to the District Court, at which time the prosecutors could revisit their charging decision. If they chose not to do so, they could provide information as to why they believed their decision was appropriate. If this approach did not resolve the problem, this Court could then revisit the petition.

Faced with the Government's charging decision, Judge Underhill could, I suppose, have acquiesced in whatever the prosecutors wanted. But he is not a piece of Steuben glass. Instead, witnessing what he perceived to be abuse, he pushed back. I believe that most conscientious jurists would have done the same. I have no difficulty concluding that Judge Underhill was right to do so. "[F]ederal

courts have authority under their supervisory powers to oversee the administration of criminal justice within federal courts." *United States v. Johnson*, 221 F.3d 83, 96 (2d Cir. 2000) (quoting *Daye v. Attorney Gen.*, 712 F.2d 1566, 1571 (2d Cir. 1983)). They should use these powers "to see that the waters of justice are not polluted" and "to protect the integrity of the federal courts." *United States v. Payner*, 447 U.S. 727, 744 (1980); *accord United States v. HSBC Bank USA, N.A.*, 863 F.3d 125, 135 (2d Cir. 2017). Their supervisory powers are not restricted to the protection of explicit constitutional rights. *McNabb v. United States*, 318 U.S. 332, 341 (1943). The powers exist "in order to maintain respect for law" and to "promote confidence in the administration of justice." *Olmstead v. United States*, 277 U.S. 438, 484 (1928) (Brandeis, J., dissenting); *accord Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974); *United States v. Getto*, 729 F.3d 221, 229 (2d Cir. 2013). The supervisory powers should be sparingly exercised. *HSBC*, 863 F.3d at 136. Judges are not, of course, free to disregard the limitations of the law they are charged with enforcing under the guise of exercising supervisory powers or at other times. *Payner*, 447 U.S. at 737. But since *Payner*, we have recognized that within their supervisory powers, courts should "not hesitate to scrutinize the Government's conduct to ensure that it comports with the highest standards of fairness." *Johnson*,

221 F.3d at 96 (quoting *United States v. Lawlor*, 168 F.3d 633, 637 (2d Cir. 1999)). This requirement applies with particular force in contexts such as charging and sentencing, especially those involving mandatory minimum sentences, where the Government plays an "often decisive role." *Id.*

Whether Judge Underhill went too far is debatable. But because this case does not come close to meeting the exacting standards for mandamus, I respectfully dissent from the majority's grant of a writ directing the District Court to allow no arguments for jury nullification. I concur to the extent that the majority denies a writ directing the District Court to exclude at trial evidence of sentencing consequences.

## I

Our knowledge of the relevant facts, as the majority concedes, is incomplete: significant holes exist in the record and pretrial proceedings remain ongoing. What we know by way of background is that in the course of a state investigation of a statutory rape charge, Connecticut prosecutors discovered a video, which they referred for federal prosecution. The video depicted Manzano, who was thirty-one, and M.M, a fifteen-year old girl who was a tenant in the building where he was superintendent, engaging in explicit sexual conduct. M.M. knew that

Manzano was recording the video at the time, and there is no evidence that he had threatened her.

Eventually, Manzano attempted to delete the video, but he was unsuccessful. Unbeknownst to him, the video remained in the cloud storage associated with Manzano's Google account, where digital forensic examiners discovered it. There is no suggestion in the record that the video was ever shared with anyone else, a point the prosecutors concede. Indeed, there is no indication in the record that anyone aside from Manzano has ever seen the video (except, of course, the Government). Because the cellular phone that recorded the video had traveled in interstate commerce, and Google cloud storage is hosted on servers in several states, the prosecutors charged Manzano with interstate production and transportation of child pornography. These offenses carry mandatory minimum sentences of fifteen and five years, respectively.

In May 2018, a grand jury indicted Manzano on the two counts and the case was assigned to Judge Underhill. Early in the case, Judge Underhill told Assistant U.S. Attorneys Neeraj Patel and Sarah Karwan what he thought of the Government's charging decision. He called this a "shocking case" and said that he was "absolutely stunned" that the Government had brought a charge carrying a

fifteen-year mandatory minimum, a charge that gave him no sentencing discretion. *United States v. Manzano*, No. 18-cr-95 (SRU) (D. Conn. Oct. 29, 2018), ECF No. ("Doc. No.") 60, at 34. The record does not contain an explanation from the prosecutors.

During pretrial proceedings, Manzano sought permission to argue for jury nullification. His counsel contended that the prosecutors' "application of the law to the particular facts of this case is an obscene miscarriage of justice" and that the conduct in question "is in no way so sinister as to warrant such a penalty" because it "is not the sort of conduct Congress sought to proscribe." Doc. No. 30, at 1-2. The court did not rule on the motion at that point.

Manzano proposed raising jury nullification during voir dire. Specifically, he requested that Judge Underhill inform the jurors of their "right to determine whether the Government has justly prosecuted" Manzano and ask whether they were "comfortable sitting in judgment over the Government's decision to prosecute." Doc. No. 35, at 1. Manzano also requested that prospective jurors be asked whether they understood that one of their "functions as jurors in judging whether the Government has justly proceeded in this prosecution is to determine whether the sentencing consequences of a conviction are fair, just and reasonable."

*Id.* at 2. Ultimately, the District Court declined to ask these questions. Judge Underhill later explained:

> I screened out jurors at jury selection, and anybody who could not follow the law we struck for cause. So this jury has already been selected with jurors who can follow the rule of law. And at that time I rejected [Manzano's] efforts to raise the jury nullification issue; and there is no reason to believe, therefore, that this jury is prone to nullification. So I have done what I can to minimize the risk of nullification, as I am required to do.

Doc. No. 62, at 3.

A week before trial was scheduled to begin, Manzano submitted a proposed jury charge on nullification, which would have instructed the jury that it had "the power to determine whether the Government has justly prosecuted Mr. Manzano for the crimes charged in this case." Doc. No. 44, at 1. The District Court did not adopt this charge, and it instead stated its intention to instruct the jury as follows:

> Duties of the Jury
>
> It is your duty to find the facts from all evidence in the case. In reaching a verdict you must carefully and impartially consider all the evidence in the case and then apply the law as I have explained it to you. *Regardless of any opinion you may have about what the law is or ought to be, it would be a violation of your sworn duty to base a verdict upon any understanding or interpretation of the law other than the one I give you. . . .*

Closing Instructions on Charged Offenses

If you, the jury, find beyond a reasonable doubt from the evidence in this case that the government has proved each of the foregoing elements for a particular count, then proof of the crime charged is complete, *and you should find Mr. Manzano guilty on that count*. . . .

The Jury Is Not to Consider Punishment

*The question of the possible punishment that Mr. Manzano will receive if convicted is of no concern to the jury and should not, in any way, enter into or influence your deliberations.* The duty of imposing a sentence rests exclusively upon the judge. Your function is to weigh the evidence in the case and to determine whether or not Mr. Manzano has been proven guilty beyond a reasonable doubt of the crimes charged, solely upon the basis of such evidence. *Under your oath as jurors, you cannot allow a consideration of the punishment that may be imposed upon Mr. Manzano, if convicted, to influence your verdict or enter into your deliberations.*

Doc No. 62, at 5-6 (emphasis added). We, of course, presume that the jury would follow these instructions.

At a pretrial conference on October 29, Manzano renewed his request to argue for jury nullification. Manzano stressed that the case involved a brief video, deleted before anyone had seen it. The Court responded:

This is a shocking case. This is a case that calls for jury nullification. *I have been told by the Second Circuit that I cannot encourage jury nullification, and I do not intend to encourage jury nullification.* But I am absolutely stunned that this case, with a 15-year mandatory minimum, has been brought by the government.

7

I am going to be allowed no discretion at sentencing to consider the seriousness of this conduct or the lack of seriousness of this conduct, and it is extremely unfortunate that the power of the government has been used in this way, to what end I'm not sure.

*So the law precludes me from charging the jury, the law precludes me from encouraging the jury, and I don't intend to do that.* But if evidence comes in about the length of sentence, or if [defense counsel] chooses to argue, I do not feel that I can preclude that. I don't feel I'm required to preclude that. And I think justice requires that I permit that. *So it's not going to come from me*, but I think justice cannot be done here if the jury is not informed, perhaps by [defense counsel], that that's the consequence here.

Doc No. 60, at 34-35 (emphasis added). The District Court, after discussing in detail the relevant law, stated, "I have no intention as I said this morning, of instructing the jury on the mandatory minimums or their power to nullify. Instead, I am simply allowing [Manzano] to argue as he chooses to argue. . . . I also intend to, as I said this morning, instruct the jury specifically that they must follow the law." Doc. No. 62, at 4-5.

Later that day, the clerk made a minute entry stating that "[Manzano's] motion is granted to the extent it seeks permission to argue for jury nullification." Contrary to what the majority contends, what Judge Underhill actually decided is, as I read the record, not set forth simply in the minute entry. That entry must be read in conjunction with his remarks on the record. He made clear that he could

not and would not encourage jury nullification. Judge Underhill explained only that if evidence of the mandatory minimum properly came before the jury, he did not think he could preclude or would be required to preclude defense counsel from making arguments to the jury based on that evidence. Whether defense counsel could fashion permissible legal arguments is something we cannot know at this point. What we do know is that Judge Underhill made unmistakably clear that he intended to instruct the jury that punishment was of no concern to them and that jurors could not allow a consideration of punishment to influence their deliberations or their verdict.

The prosecutors moved to stay the trial to allow time to pursue a potential mandamus petition. After explaining why mandamus was not appropriate and warning that forbidding Manzano from making arguments grounded in properly admitted evidence could raise Sixth Amendment concerns, the District Court stayed the trial pending resolution of any mandamus petition filed by the prosecutors.

## II

An especially unsettling aspect of this case is that the record the prosecution presented to the District Court and to this Court is barren of anything that would

9

explain, much less justify, the prosecutors' decision to file the most serious child pornography charges available to them against a man who made a single video which no one else ever saw and which he then attempted to erase. Based on what he had seen, Judge Underhill believed that a miscarriage of justice would occur if this man were required to spend fifteen years in prison for this conduct.

During proceedings below, Judge Underhill called on the prosecutors to explain their charging decision. They did not do so.[1] During oral argument, we asked Assistant U.S. Attorney Sandra Glover for help in understanding the Government's charging decision. Again, we got nothing of use. We were told only that the Government had additional information about Manzano that it expected to bring forth at sentencing. The incompleteness of the record before us underscores the inappropriateness of mandamus. I do not believe mandamus can be an appropriate remedy when essential information is unavailable.

If convicted, Manzano deserves substantial punishment, but the conduct charged in this case does not remotely resemble the conduct for which prosecutors have threatened fifteen-year mandatory sentences in any of the myriad child pornography cases decided in this Circuit. *See, e.g.*, *United States v. Brown*, 843 F.3d

---

[1] Instead, they stated that they might offer evidence in rebuttal or at sentencing that would speak to the appropriateness of a lengthy sentence. Doc. No. 60, at 35-36.

74, 78 (2d Cir. 2016) (25,000 still images, 365 videos, 4 images involving torture, 60 displaying bondage, 30 depicting bestiality, 18 involving infants, 294 victims); *United States v. Gilmore*, 599 F.3d 160, 162 (2d Cir. 2010) (70 photographs of eight-year-old daughter distributed online; physical sexual abuse facilitated by liquor and sleeping pills; collection of 662 images and 10 video clips); *United States v. Jimenez*, No. 16-cr-60-A, 2019 WL 2211458, at *1 (W.D.N.Y. May 22, 2019) (babysitter repeatedly raped and photographed three-year-old girl over the course of eight-and-a-half months); *United States v. Thomas*, No. 12-cr-37, 2018 WL 4146596, at *2 (D. Vt. Aug. 30, 2018) (hundreds of videos and misrepresentation of identity to solicit 12-year-old girl); *United States v. Rafferty*, 529 F. App'x 10, 12 (2d Cir. 2013) (summary order) (production of four videos of nine-year-old girl engaging in sexual conduct with mentally ill adult woman); *United States v. Spoor*, 904 F.3d 141, 146 (2d Cir. 2018) (numerous videos of seven- and eight-year-old boys, including defendant's son, filmed using hidden camera); *United States v. Archambault*, 740 F. App'x 195, 202 (2d Cir. 2018) (summary order) (recidivist offender with evidence of repeated acts of predation); *United States v. Broxmeyer*, 699 F.3d 265, 269-70 (2d Cir. 2012) (field hockey coach distributed explicit photos of himself to high school students, encouraged them to produce similar images,

11

and engaged them in intercourse and sodomy); *United States v. Puglisi*, 458 F. App'x 31, 35-36 (2d Cir. 2012) (summary order) (teacher offered repeated material inducements to teenage students and obstructed authorities' attempts to obtain evidence). *See generally United States v. Jenkins*, 854 F.3d 181, 188 (2d Cir. 2017) (discussing the severity of child pornography sentencing); *United States v. Dorvee*, 616 F.3d 174, 186 (2d Cir. 2010) (same).

It is highly unlikely—indeed inconceivable—that what Manzano did was what Congress had in mind when it provided for fifteen-year mandatory sentences. *Cf. United States v. Murphy*, 942 F.3d 73, 80 (2d Cir. 2019) (recognizing the relevance of "how the statute was intended to operate" in assessing the propriety of up to thirty years' imprisonment for a charged offense). Manzano's single video did not involve the commercial production or distribution or filesharing of child pornography. The video, made with the knowledge of both subjects, did not depict sadistic, masochistic, or violent conduct. The charged offense involved one video, not 600 or more images.[2] Moreover, whereas courts

---

[2] Manzano's conduct was less severe than the vast majority of cases where mandatory minimum sentences were imposed. Unlike 96.9% of transportation cases, the single video at issue did not depict a minor under the age of 12. *See* U.S. Sentencing Comm'n, *Federal Child Pornography Offenses* 209, 266 (2012). Unlike 82.1% of transportation cases, it did not involve sadistic, masochistic, or violent conduct. *See id.* at 209. It did not involve the commercial production, distribution, or sharing of child pornography, and it certainly did not involve 600 or more images. *See id.* at xi

have typically treated "personal" distribution of child pornography (e.g., individual email or direct communication between two offenders) to adult offenders as the most serious offense, this case involves unintentional transmission to a computer system, accessed only by law enforcement. *See* U.S. Sentencing Comm'n, *Federal Child Pornography Offenses* 151-52 (2012). Even those cases where only possession is charged and no mandatory minimum is threatened generally involve these features, but they are absent here. *See id.* at 209 tbl.8-1.

U.S. Attorney John H. Durham may not have been aware that the Sentencing Commission has emphasized in no uncertain terms that "the mandatory minimum penalties for certain child pornography offenses and the resulting guidelines sentencing ranges may be excessively severe and as a result are being applied inconsistently," U.S. Sentencing Comm'n, *Mandatory Minimum Penalties for Federal Sex Offenses* 56 (2019). Speaking to this inconsistency, the Commission has observed that "there is little difference in the underlying conduct of offenders charged with possession offenses," which do not carry a mandatory minimum penalty, "compared to the conduct of offenders charged with receipt offenses," which do carry a mandatory minimum. *Id.* at 48. As of 2012, 95.3% of offenders

n.57, 125, 209; U.S.S.G. § 2G2.2, Commentary ¶ 6(B)(ii) (2018) (treating a video as equivalent to seventy-five images).

sentenced only for possession had engaged in conduct that would have carried at least a five-year mandatory minimum if more severe charges had been brought. *Id.* at 14.

Recognizing the harshness of the statutory penalties, federal prosecutors in this Circuit have generally made reasonable charging decisions, reserving fifteen-year mandatory minimum sentences for the worst offenders. Yet in this case, faced with an offense that would not even have qualified for common sentencing enhancements if only possession had been charged, prosecutors have chosen to bring the most severe charges available to them, threatening—for a single video that was never shared and was later deleted—a mandatory minimum that many physical sexual abuse offenses do not carry. *See id.* (explaining that only 52.3% of physical sexual abuse offenders face a fifteen-year mandatory minimum sentence); *cf., e.g., Flores v. Barr*, No. 17-3421 (2d Cir. Oct. 17, 2017), ECF No. 100, at 4 (describing a three-and-a-half year sentence for a man who repeatedly sexually assaulted his seven- and eleven-year-old step-grandchildren). Nothing in the record explains Durham's choice in this case. Perhaps the Government has good reasons for what it did. If so, knowledge of those reasons would certainly assist me in evaluating the prosecutor's application for mandamus.

## III

In any event, the requirements for mandamus have not been met. A writ of mandamus is intended to confine the court against which mandamus is sought to the "lawful exercise of its prescribed jurisdiction." *Cheney v. U.S. Dist. Court for D.C.*, 542 U.S. 367, 380 (2004). It is "a drastic and extraordinary remedy reserved for really extraordinary causes." *Id.* "Mere error, even gross error in a particular case . . . does not suffice to support issuance of a writ." *In re United States*, 733 F.2d 10, 13 (2d Cir. 1984). The Supreme Court has said that it "has never approved the use of the writ to review an interlocutory procedural order in a criminal case which did not have the effect of a dismissal." *Will v. United States*, 389 U.S. 90, 98 (1967). It has also said that mandamus "has been invoked successfully where the action of the trial court totally deprived the Government of its right to initiate a prosecution and where the court overreached its judicial power to deny the Government the rightful fruits of a valid conviction." *Id.* at 97-98 (citations omitted). Judge Underhill was unquestionably "within his jurisdiction." This case is an important one but is not, on any reasonable calculus, extraordinary. And the majority submerges itself in error correction. The use of mandamus to supervise

15

pretrial proceedings takes this Court on an ill-advised journey down the wrong road.

A petitioner seeking mandamus must establish that (1) there are "no other adequate means to attain the [desired] relief," (2) the "right to issuance of the writ is clear and indisputable," and (3) "the writ is appropriate under the circumstances." *Cheney*, 542 U.S. at 380-81. This test has not been satisfied.

### *Adequate Alternative for Relief*

The majority and I interpret what Judge Underhill decided differently. The majority concludes that "there can be no doubt that the district court granted defense counsel's request to argue jury nullification at trial, and that such a ruling was not contingent on later evidentiary rulings of this court." Majority Op. at 12. That assertion is inconsistent with my reading of the record. What Judge Underhill said is that "[i]f I, under certain circumstances, can admit evidence of the mandatory minimum, *if that evidence comes in as a matter of trial evidence*, he is permitted to argue from that to the jury, period." Doc. No. 62, at 6-7 (emphasis added). Judge Underhill's amicus brief explains that "the District Court was clear that it will permit [jury nullification] argument[s] only if evidence of the mandatory minimums is found admissible at trial." Underhill Amicus Br. at 14.

Judge Underhill has not allowed Manzano to argue unqualifiedly for jury nullification.

What the District Court has done is decline to preclude Manzano from attempting to do so in the event that he is later able to lay the proper foundation for introducing evidence of the mandatory minimums. Mandamus is not available to review this ruling because it was a conditional ruling which does "not foreclose" the relief the Government seeks. *Kerr v. U.S. Dist. Court for N. Dist. of Cal.*, 426 U.S. 394, 404 (1976). Evidence of mandatory minimum sentences, if and when it is offered at trial, might not be admissible under the Federal Rules of Evidence. Defense counsel might fail to lay adequate foundation for this evidence, or the Government might prevail in its objection to the proffer. If the Government succeeds in keeping the evidence out, no argument from that evidence, whether for jury nullification or some other purpose, will be permitted. Even if the evidence is admitted, the Government might succeed in a later objection in cabining defense counsel's closing argument or in preventing nullification arguments altogether because of what actually happened at trial. At this point, no one knows what may happen. I do not believe that the minute entry can properly be read in isolation from Judge Underhill's explanation of what he intended. Judge Underhill viewed

17

his ruling as contingent, and mandamus is not available when "[i]t is clear that the district judge . . . does not view his action as being final," *In re Cohn*, 416 F.2d 440, 441 (2d Cir. 1969) (per curiam). Prosecutors have no right to appeal *potential* evidentiary errors.

But which side has the better of this argument does not matter. Assuming the majority is correct, the prosecutors are still not entitled to mandamus. The only reason the majority posits as to why the prosecutors have no adequate alternative for relief is that, if Manzano is acquitted, Judge Underhill's evidentiary decisions will not be appealable. This contention is a nonstarter. The point is not merely that the prosecutors have an adequate alternative for relief; the point is that they are not entitled to the relief they want in the first place. Our case law is unambiguous that the fact that the Government may be unable to appeal is insufficient to warrant mandamus review. *Will* is clear as can be on this point: "Nor is the case against permitting the writ to be used as a substitute for interlocutory appeal made less compelling by the fact that the Government has no later right to appeal." 389 U.S. at 97; *accord United States v. Sam Goody, Inc.*, 675 F.2d 17, 25 (2d Cir. 1982); *United States v. Margiotta*, 662 F.2d 131, 134 n.8 (2d Cir. 1981); *United States v. Weinstein*,

511 F.2d 622, 626 (2d Cir. 1975); *see also United States v. Coonan*, 839 F.2d 886, 896 (2d Cir. 1988) (Altimari, J., dissenting).

We are dealing with an evidentiary ruling in a context in which Congress has spoken. Mandamus should not be employed to amend statutes. 18 U.S.C. § 3731 limits appeals by the Government from evidentiary decisions in criminal cases to appeals "from a decision or order of a district court suppressing or excluding evidence . . . if the United States attorney certifies to the district court that the appeal is not taken for purpose of delay and that the evidence is a substantial proof of a fact material in the proceeding." The statute does not allow appeals from orders admitting evidence, deferring ruling on motions, or setting bounds on closing arguments. "Congress clearly contemplated when it placed drastic limits upon the Government's right of review in criminal cases that it would be completely unable to secure review of some orders having a substantial effect on its ability to secure criminal convictions." *Will*, 389 U.S. at 97 n.5. Mandamus, the Supreme Court has cautioned, "may never be employed as a substitute for appeal in derogation of these clear policies." *Id.* at 97. Our Court has further emphasized that "[u]se of the writ as a substitute for appeal or as a means

of circumventing the Criminal Appeals Act [18 U.S.C. § 3731] is barred." *Weinstein*, 511 F.2d at 626.

The fact that some appellate judges might be firmly convinced that trial court decisions are wrong is of no moment. "Certainly, Congress knew that some interlocutory orders might be erroneous when it chose to make them nonreviewable." *Will*, 389 U.S. at 98 n.6. The majority's reasoning, with respect, contains no analytic limitation on the types of pretrial rulings on arguments or trial management issues that can or cannot be the subject of mandamus or that can or cannot reach this Court on interlocutory appeal. The majority's approach, in other words, is entirely ad hoc. And ad hoc jurisprudence generates chaos.

### No Clear and Indisputable Right

Moreover, the Government is not entitled to mandamus because its right to the writ is not "clear and indisputable," something the Government concedes *twice. See* Pet. at 27 ("[T]his Court has not expressly held that a defendant may not argue for nullification . . . ."); Reply at 12 ("As the government acknowledged in its petition, there is no case from this Court expressly addressing the precise situation here."). No decision of this Court has even addressed, let alone clearly and indisputably decided, whether, given what the prosecutors below are doing,

a district court has the discretion to permit defense counsel to make arguments of some sort or another that raise nullification.

The majority attempts to sidestep this failure by arguing that this requirement can be dispensed with so long as "we are firmly convinced that the district court's view of the law was incorrect." Majority Op. at 15. There are significant problems with this approach. It reads the "clear and indisputable" requirement out of the test. That I am "firmly convinced" an error has occurred simply means that I believe I am correct. Someone's firm conviction, however strong or sincere, is not (and can never be) the same thing as a "clear and indisputable right." After all, a great many evidentiary or procedural rulings made during the course of a trial can leave an impression with one or another appellate judge that the ruling was incorrect. If a "firm belief" that error has occurred were sufficient, no justiciable standard for mandamus would, or could ever, exist.[3]

Our jurisdiction as prescribed in 28 U.S.C. § 1291 entitles litigants to appeal to this court from "final decisions." A limited number of exceptions are set forth

---

[3] The majority claims that the "firm conviction" standard is routinely applied, noting its similarity to the clear error standard used in reviewing district courts' findings of fact. However, although a "firm conviction" may be enough to show that an error was clear, it does not establish that the matter is indisputable or that a writ of mandamus should issue. I may be firmly convinced of a proposition while acknowledging that it is subject to dispute, and mandamus is an inappropriate remedy in such a situation.

in § 1292 and in 18 U.S.C. § 3731 for criminal appeals. On the one hand, these provisions cut off most interlocutory appeals. On the other, they ensure that courts of appeals function in the way Congress intended. The fact that the term "final decisions" is generally very well understood is an important source of fairness and predictability in appellate procedure. Only a narrow class of decisions can trigger interlocutory appeals. Litigants and jurists, therefore, know which matters can and cannot get before a court of appeals and how to get them there. The majority's ad hoc approach does violence to this understanding because it makes the availability of interlocutory appeals unknowable in advance and essentially dependent on random considerations such as the preferences of panel members.

In the absence of controlling precedent, the majority relies on *United States v. Thomas*, 116 F.3d 606 (2d Cir. 1997). The majority claims that *Thomas* addressed "a court's knowing failure to remove a juror who is intent on nullification." Majority Op. at 17. However, in *Thomas*, we vacated several convictions because, desirous of preventing nullification, the district court had removed a deliberating juror who simply found the Government's evidence insufficient. Far from sounding an alarm about the dangers of nullification, *Thomas* warned against too probing an inquiry into whether deliberating jurors intend to nullify, for fear that

this inquiry would "permit judicial interference with, if not usurpation of, the fact-finding role of the jury." *Id.* at 622.

More pointedly, the entire discussion of jury nullification upon which the majority now relies was unnecessary to the ultimate holding in *Thomas* and was, therefore, dicta that cannot support or justify mandamus relief. Only holdings create "established law"; language that is unnecessary to those holdings does not. *See* Pierre N. Leval, *Judging Under the Constitution: Dicta About Dicta*, 81 N.Y.U. L. Rev. 1249, 1282 (2006) ("If a rule was declared only in dictum, the question remains undecided."). The holding of *Thomas* was that a district judge may properly remove for cause a juror who refuses to follow the law only if the record leaves no doubt that the juror would engage in nullification. 116 F.3d at 618, 622, 625. The question whether a district court has the discretion, in an appropriate case, to permit a defense lawyer to discuss jury nullification was not before the Court, was not decided by the Court, and, as noted, remains an open question in this Circuit.[4]

In addition to being an open question, it is a difficult and nuanced one. Closing arguments of defense counsel have long been recognized as a

---

[4] The majority also invokes *Shannon*, 512 U.S. 573 (1994), *Polouizzi*, 564 F.3d 142 (2d Cir. 2009), and *Pabon-Cruz*, 391 F.3d 86 (2d Cir. 2004). Nothing in the holding of any of these cases speaks to appropriate limitations on a defendant's summation. Each addresses whether a *judge* may inform the jury of sentencing consequences or encourage nullification in the *court's* charge.

fundamental aspect of a fair trial, and a judge presiding over trial "must be and is given great latitude" over the scope of summations. *Herring v. New York*, 422 U.S. 853, 862 (1975). Appellate courts are not well-suited, particularly on truncated records involving ongoing proceedings, to ensure that a trial is fair.

## *Writ Inappropriate Under the Circumstances*

Finally, the writ is not appropriate under the circumstances of this case. Judge Underhill was confronted with a charging decision by the prosecutors that prima facie indicated serious overreach and foreshadowed a miscarriage of justice. At each step, he gave thoughtful consideration to the issues raised, the relevant precedent, and the magnitude of the stakes involved, not just as they impacted the prosecutors but also as they impacted a man about to be sentenced (by the prosecutors) to fifteen years of incarceration. Consistent with *Thomas*, he empaneled only jurors who could follow the law. Consistent with *Shannon*, *Polouizzi*, and *Pabon-Cruz*, he made unmistakably clear his intention to instruct the jury that they must not consider punishment in determining guilt. Given the gross uncertainty that exists at the intersection between prima facie prosecutorial overreach and arguments that might sound in nullification, Judge Underhill

walked a fine line. Jurists might agree or disagree with what he did, but there was

no abuse of discretion and certainly none that was clear and indisputable.

I would deny the petition in its entirety.